ORAL ARGUMENT NOT YET SCHEDULED

CONSOLIDATED BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

Nos. 15-3056, 15-3065, 15-3066, & 15-3067

———————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

DAWAYNE BROWN, *et al.*                    Appellants.



———————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

CHANNING D. PHILLIPS
United States Attorney

ELIZABETH TROSMAN
ELIZABETH H. DANELLO
TEJPAL S. CHAWLA
GEORGE P. ELIOPOULOS
* JAMES A. EWING, D.C. Bar #998829
Assistant United States Attorneys

* Counsel for Oral Argument
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
(202) 252-6829

Cr. Nos.  13-cr-203 (RJL)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellants, Dawayne Brown (15-3056), Marquette Boston (15-3065), Keith Matthews (15-3066), and Ira Adona (15-3067), and appellee, the United States of America. There are no intervenors or *amici*.

## Rulings Under Review

Appellants challenge various trial and sentencing rulings of the district court (the Honorable Richard J. Leon), including: (1) the district court's denial of appellant Boston's motion for a judgment of acquittal on the charge of possession with the intent to distribute ("PWID") phencyclidine ("PCP"); (2) the court's jury instructions regarding the charges against appellant Brown for: (a) burglary; (b) unlawful possession of a firearm; and (c) PWID PCP; (3) the court's calculation of drug quantity in determining Brown's base-offense level under the sentencing guidelines; (4) the court's sentence of appellant Adona,

specifically (a) the court's order that Adona's sentence run consecutively to a D.C. Superior Court sentence and (b) the court's upward variance based on Adona's use of violence; and (5) the court's sentence of appellant Matthews, specifically (a) the court's conclusion that Matthews's prior conviction for attempted assault with a dangerous weapon was a "crime of violence" under U.S.S.G. § 4B1.2(a) and (b) the court's explanation for departing upward from Matthews's guidelines range.

## Related Cases

In a published pretrial ruling, Judge Leon granted appellants Brown's, Adona's, and Matthews's (along with then-codefendant Breal Hicks's) motion to dismiss several counts of the indictment that alleged violations of 18 U.S.C. § 924(c). *United States v. Brown*, 58 F. Supp. 3d 115 (D.D.C. 2014).

Codefendants Hicks and Conovia Eddie, indicted with the four co-appellants, pleaded guilty to conspiracy to distribute PCP (Hicks) and maintaining a drug-involved premises (Eddie) (D.E. 343, 366). Judge Leon sentenced the two to, *inter alia*, 84 months (Hicks) and one year and one day (Eddie) of incarceration (*id.*). Neither Hicks nor Eddie noted an appeal.

In conjunction with a global plea agreement that encompassed his plea in the instant case, appellant Adona pleaded guilty to attempted assault with a dangerous weapon, in violation of D.C. Code §§ 22-402, -1803, in D.C. Superior Court case number 2013-CF3-3966. The Honorable Patricia Broderick of the D.C. Superior Court sentenced Adona to 28 months of incarceration on that count (J.A.:344).

Ms. Tiffany Williams, who testified for the government at trial pursuant to a cooperation agreement, pleaded guilty to keeping a bawdy or disorderly house, in violation of D.C. Code § 22-2722 in D.C. Superior Court case number 2013-CF2-4774.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the Addendum to the Briefs for Appellants.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE............................................ 1

The Boston, Matthews, and Brown Trial..........................................3

The Government's Evidence ....................................................3

The Defense Evidence................................................................16

1.  Brown ..........................................................................16

2.  Matthews....................................................................16

3.  Boston..........................................................................17

SUMMARY OF ARGUMENT.......................................................17

ARGUMENT ...................................................................................18

I.  The Evidence Supported Boston's PWID PCP Conviction. .......18

A.  Standard of Review and Legal Principles ..........................18

B.  Discussion ........................................................................19

II.  Brown's Instructional Claims Are Waived or Otherwise Meritless. ....................................................................................24

A.  Overall Standard of Review................................................24

B.  Discussion ........................................................................25

1.  Brown's UF Instruction Claim ..................................25

a.  Additional Background.............................................25

b.  Analysis....................................................................30

i.  Brown's Claim Is Waived. ................................30

ii. Even if Not Waived, Brown's UF Claim Is Meritless..........................................................31

2.    Brown's PWID PCP Special Unanimity Claim ..........37

a.   Additional Background ..........................37

b.  Analysis ..............................................38

3.    The Second-Degree Burglary Instruction .................43

a.    Additional Background ..................................43

b.  Analysis..................................................44

III. Brown's Sentencing Claim Is Based on a Faulty Factual
Premise. ....................................................................49

A.  Additional Background ................................49

B.  Discussion....................................................51

IV. Adona   Waived   his   Sentencing   Claims,   Which   Are
Meritless. ....................................................................53

A.    Additional Background................................53

1.  Adona's Plea Agreement ..............................53

2.  The District Court Plea Hearing ..................56

3. The Superior Court Attempted ADW Case ...................57

4.    The District Court Presentence Report......................59

5.    The Presentencing Hearing ........................60

6.    The District Court Sentencing Hearing ....................61

B.    Discussion ..................................................63

1. Adona's Claims Are Waived........................................63

2.  Even if Considered, Adona's Claims Are
Meritless..................................................66

a.   The District Court Was Not Required to Order Partially Concurrent Service of Adona's Sentences............................................................67

b.   The District Court Did Not Impermissibly Vary Upward ..................................................................71

V. Matthews's Sentencing Claims Fail. .........................................74

A.   Attempted ADW is a Crime of Violence.............................74

1.   Background .................................................................74

2.   Standard of Review and Legal Principles .................75

3.  Discussion ...................................................................77

i.  The Elements Clause .........................................77

ii. The Residual Clause ..........................................82

B.   The District Court Adequately Explained Matthews's Sentence. ............................................................................84

CONCLUSION .......................................................................................88

# Table of Authorities*

Pages

*Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) .........................69

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) ....................................28

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ...................................33, 34

\* *Beckles v. United States*, 137 S. Ct. 886 (2017) ................................78, 83

*Begay v. United States*, 553 U.S. 137 (2008) ..........................................77

*Blair-Bey v. Quick*, 151 F.3d 1036 (D.C. Cir. 1998) ...............................32

*Bodrick v. United States*, 892 A.2d 1116 (D.C. 2006) ............................46

*Dorman v. United States*, --- F.3d --- ,
    2017 WL 2697979, at *4 (D.C. Cir. 2017) .........................................23

\* *Eady v. United States*, 44 A.3d 257 (D.C. 2012) ...................32, 33, 34, 35

*Hill v. United States*, 827 F.3d 560 (7th Cir. 2016) ................................82

*Horton v. United States*, 244 F.3d 546 (7th Cir. 2001) ...........................40

\* *In re Sealed Case (I)*, 548 F.3d 1085 (D.C Cir. 2008) .............................75

*In re Sealed Case (II),* 527 F.3d 188 (D.C. Cir. 2008) .............................87

\* *Jackson v. Virginia*, 443 U.S. 307 (1979) ...............................................18

*Johnson (Curtis) v. United States*, 559 U.S. 133 (2010) .........................79

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Johnson (Samuel) v. United States*, 135 S. Ct. 2551 (2015)...................83

*Nelson v. United States*, 601 A. 2d 582 (D.C. 1991)...............................48

*Nkop v. United States*, 945 A.2d 617 (D.C. 2008)...................................77

*Parks v. United States*, 627 A.2d 1 (D.C. 1993) ....................................80

*Perry v. United States*, 36 A.3d 799 (D.C. 2011)..............................80, 81

*Pollard v. District of Columbia*, 191 F. Supp. 3d 58 (D.D.C. 2016) .......19

\* *Portillo v. United States*, 62 A.3d 1243 (D.C. 2013) ........................45, 46

\* *Richardson v. United States*, 526 U.S. 813 (1999) ..........................38, 39

*Schad v. Arizona*, 501 U.S. 624 (1991) ..................................................40

*Setser v. United States*, 566 U.S. 231 (2012) .........................................67

\* *Spencer v. United States*, 991 A.2d 1185 (D.C. 2010)......................76, 77

*Stewart v. United States*, 324 F.2d 443 (D.C. Cir. 1963).......................48

*Stinson v. United States*, 508 U.S. 36 (1993)........................................81

*United States v. Adams*, 780 F.3d 1182 (D.C. Cir. 2015) ......................64

*United States v. Akhigbe*, 642 F.3d 1078 (D.C. Cir. 2011) ..............85, 87

*United States v. Alexander*, 331 F.3d 116 (D.C. Cir. 2003) .............19, 20

\* *United States v. Booker*, 436 F.3d 238 (D.C. Cir. 2006) ........................18

*United States v. Booker*, 543 U.S. 220 (2005) ........................................70

*United States v. Boyd*, 803 F.3d 690 (D.C. Cir. 2015) ...........................19

*United States v. Brinson-Scott*, 714 F.3d 616 (D.C. Cir. 2013) ............. 19

*United States v. Brown (James),*
    808 F.3d 865 (D.C. Cir. 2015)................................................. 72, 86, 88

*United States v. Brown*, 58 F. Supp. 3d 115 (D.D.C. 2014) ..................... 2

*United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999) ........................... 18

*United States v. Collins*, 811 F.3d 63 (1st Cir. 2016) ........................... 78

*United States v. Cotton*, 535 U.S. 625 (2002)........................................ 43

*United States v. Dingle*, 114 F.3d 307 (D.C. Cir. 1997)........................ 24

*United States v. Farrow*, 198 F.3d 179 (6th Cir. 1999) ........................ 68

*United States v. Godoy*, 706 F.3d 493 (D.C. Cir. 2013) ........................ 66

*United States v. Guillen*, 561 F.3d 527 (D.C. Cir. 2009) ...................... 63

*United States v. Harrison,* 103 F.3d 986 (D.C. Cir. 1997)..................... 31

*United States v. Heard*, 359 F.3d 544 (D.C. Cir. 2004) ........................ 68

*United States v. Hill*, 131 F.3d 1056 (D.C. Cir. 1997) ........................... 78

*United States v. Hodge*, 354 F.3d 305 (4th Cir. 2004) .......................... 72

*United States v. Hubbard*, 889 F.2d 277 (D.C. Cir. 1989)..................... 41

*United States v. Hunt*, 843 F.3d 1022 (D.C. Cir. 2016) ......................... 41

*United States v. James,* 764 F.2d 885 (D.C. Cir. 1985) ......................... 22

*United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991) ..................... 23

*United States v. Johnson*, 592 F.3d 164 (D.C. Cir. 2010)....................... 23

*United States v. Jones*, 846 F.3d 366 (D.C. Cir. 2017) ........................... 85

*United States v. Kaufman*, 791 F.3d 86 (D.C. Cir. 2015) ...................... 66

*United States v. Kayode*, 254 F.3d 204 (D.C. Cir. 2001) ...................... 40

*United States v. Kenney*, 283 F.3d 934 (8th Cir. 2002) .......................... 68

*United States v. Long*, 905 F.2d 1572 (D.C. Cir. 1990) .......................... 20

*United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995) ............................ 24

*United States v. Mack*, 841 F.3d 514 (D.C. Cir. 2016) ........................... 53

*United States v. Mack*, 855 F.3d 581 (4th Cir. 2017) ............................ 81

*United States v. Mancuso*, 718 F.3d 780 (9th Cir. 2013) ........................ 39

*United States v. Mangieri*, 694 F.2d 1270 (D.C. Cir. 1982) ............. 41, 47

*United States v. Marlon Haight*, 15-cr-88 (unpublished ruling
    at sentencing on 12/1/2016 by Judge Boasberg) ................................ 80

*United States v. Massino*, 546 F.3d 123 (2d Cir. 2008) ......................... 52

*United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) ........................ 32

*United States v. Molinaro*, 877 F.2d 1341 (7th Cir. 1989) ..................... 23

*United States v. Moore*, 703 F.3d 562 (D.C. Cir. 2012) .......................... 72

\*   *United States v. Nania*, 724 F.3d 824 (7th Cir. 2013) ............................ 70

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) .............................. 36

\*   *United States v. Olano*, 507 U.S. 725 (1993) ............ 25, 34, 35, 36, 41, 43

*United States v. Ovalle-Chun*, 815 F.3d 222 (5th Cir. 2016) ................. 78

*United States v. Park*, 421 U.S. 658 (1975) .............................................. 48

*United States v. Parnell*, 818 F.3d 974 (9th Cir. 2016) .................... 79, 82

*United States v. Ransom*, 756 F.3d 770 (D.C. Cir. 2014) ....................... 86

\* *United States v. Redrick*, 841 F.3d 478 (D.C. Cir. 2016) ................. 77, 79

*United States v. Rollins*, 836 F.3d 737 (7th Cir. 2016) ........................... 81

\* *United States v. Salamanca*, 990 F.2d 629 (D.C. Cir. 1993) ................. 18

*United States v. Schiro*, 679 F.3d 521 (7th Cir. 2012) ............................ 38

*United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016) ...................... 76

*United States v. Singletary*, __ Fed. App'x __,
  2017 WL 1437227, at \*1 (4th Cir. 2017) ............................................. 70

*United States v. Smith*, 2015 WL 5136871, at \*3 (D. Md. 2015) ............ 78

*United States v. Smith*, 741 F.3d 1211 (11th Cir. 2013) ........................ 53

*United States v. Snow*, 462 F.3d 55 (2d Cir. 2006) ................................. 20

*United States v. Szakacs*, 212 F.3d 344 (7th Cir. 2000) ........................ 68

*United States v. Tarik Butler*, --- F. Supp. 3d --- ,
  2017 2304215 (D.D.C. May 25, 2017) (Judge Kollar-Kotelly) ........... 80

\* *United States v. Taylor*, 339 F.3d 973 (D.C. Cir. 2003) ........ 45, 52, 69, 81

*United States v. Taylor,* 843 F.3d 1215 (10th Cir. 2016) ....................... 78

*United States v. Thompson*, 851 F.3d 129 (1st Cir. 2017) ...................... 83

*United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012) ......................... 19

*United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006) ......................... 40

*United States v. Wahl,* 290 F.3d 370 (D.C. Cir. 2002) ........................... 18

\* *United States v. Wheeler (J.D.),*
525 F.3d 1254 (D.C. Cir. 2008) ............................................... 24, 32, 45

*United States v. Wheeler (Jacqueline),*
753 F.3d 200 (D.C. Cir. 2014) ........................................................ 31

\* *United States v. Whindleton*, 797 F.3d 105 (1st Cir. 2015) ................... 80

*United States v. Wilson,* 605 F.3d 985 (D.C. Cir. 2010)......................... 52

*Voisine v. United States*, 136 S. Ct. 2272 (2016) .................................. 81

*Wainwright v. Sykes*, 433 U.S. 72 (1977) ............................................ 31

\* *Williams v. Martinez*, 586 F.3d 995 (D.C. Cir. 2009) ...................... 32, 45

\* *Williams v. United States*, 137 A.3d 154 (D.C. 2016)............................ 36

## Other Authorities

18 U.S.C. § 3553(a) ..........................................................................55, 67

18 U.S.C. § 3584(a) ................................................................................ 67

18 U.S.C. § 3742 ..................................................................................... 63

18 U.S.C. § 922(g)(1).............................................................................. 3

18 U.S.C. § 924(e)(2)(B)(ii) ................................................................... 82

18 U.S.C. § 924(e)(2)(B)(i) .................................................................... 78

21 U.S.C. § 841(a)(1)..........................................................................2, 18

21 U.S.C. § 841(b)(1)(C).................................................................2, 18, 63

21 U.S.C. § 846........................................................................2, 63

21 U.S.C. § 861(a)........................................................................3

21 U.S.C. § 861(d)........................................................................3

D.C. Code § 7-2502.01(a)................................................................2

D.C. Code § 7-2507.06(2)(A)............................................................2

D.C. Code § 7-2507.06(a)(2)(A).........................................................25

D.C. Code § 22-402.......................................................................2

D.C. Code § 22-801(a)...................................................................43

D.C. Code § 22-801(b)....................................................................2

D.C. Code § 22-4502.....................................................................2

D.C. Code § 22-4504(a)(2)..............................................................33

Fed. R. Crim. P. 30(d)..................................................................24

Fed. R. Crim. P. 52(b)..................................................................69

24. U.S.S.G. § 2D1.1(c)(8)..............................................................52

U.S.S.G. § 1B1.3(a)(1)..................................................................72

U.S.S.G. § 1B1.3(a)(1)(2)..............................................................72

U.S.S.G. § 1B1.3(a)(2)..................................................................72

U.S.S.G. § 2D1.1(b)(12)................................................................59

U.S.S.G. § 2D1.1(b)(2) ........................................................................59

U.S.S.G. § 2D1.1(c)(10) ......................................................................52

U.S.S.G. § 2K2.1(a)(3)(A) ...................................................................75

U.S.S.G. § 2K2.1(a)(3)(B) ...................................................................74

U.S.S.G. § 2K2.1(a)(6) ........................................................................74

U.S.S.G. § 2K2.1(b)(5) ........................................................................68

U.S.S.G. § 3B1.4 .................................................................................59

U.S.S.G. § 4A1.1 .................................................................................73

U.S.S.G. § 4A1.2(a) .............................................................................73

\*    U.S.S.G. § 4B1.2(a)(1) .........................................................................77

U.S.S.G. § 5G1.3(b)(1) ........................................................................69

U.S.S.G. § 5G1.3(b)(2) ........................................................................69

# ISSUES PRESENTED

I.    Whether the evidence was sufficient to support appellant Boston's conviction for possession with the intent to distribute PCP.

II.    Assuming the availability of appellate review, whether, as to appellant Brown, the district court plainly erred in instructing the jury regarding the offenses of unlawful possession of a firearm (second offense), possession with the intent to distribute PCP, and/or burglary.

III.    Whether, as to Brown, the district court committed plain procedural error in calculating drug quantity for sentencing purposes.

IV.    Assuming the availability of appellate review, whether the district court plainly erred in ordering that appellant Adona's sentence run consecutively to a D.C. Superior Court sentence and, alternatively, whether the court improperly varied upward from the guidelines based on conduct that was the subject of the Superior Court conviction.

V.    Whether, as to appellant Matthews, the district court plainly erred by considering the D.C. Code offense of attempted assault with a dangerous weapon as a "crime of violence" for sentencing guidelines purposes, and/or providing an inadequate statement of reasons for Matthews's sentence.

xvi

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————————

Nos. 15-3056, 15-3065, 15-3066, & 15-3067
————————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

DAWAYNE BROWN, *et al.*                       Appellants.

————————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————————

CONSOLIDATED BRIEF FOR APPELLEE
————————————————

## COUNTERSTATEMENT OF THE CASE

On September 10, 2013, a grand jury returned a 39-count indictment charging appellants Brown, Boston, Matthews, and Adona, along with codefendants Breal Hicks and Conovia Eddie, with conspiracy to distribute and possess with intent to distribute ("PWID") one kilogram or more of phencyclidine ("PCP") and related offenses (J.A.:72-98).

On November 5, 2014, Adona pleaded guilty before the Honorable Richard J. Leon to conspiracy to distribute and possess PCP (21 U.S.C. §§ 846 & 841(b)(1)(C)) (J.A.:317-25). As part of a global agreement, Adona separately pleaded guilty to attempted assault with a dangerous weapon (ADW) (D.C. Code §§ 22-402, -4502) in D.C. Superior Court case number 2013-CF3-3966 (J.A.:102, 293-316).

As for the other appellants, Judge Leon granted various pretrial motions by both parties to dismiss or reduce certain counts of the indictment (S.A.:58-59, 60-64). *See also United States v. Brown*, 58 F. Supp. 3d 115, 116 (D.D.C. 2014). Beginning on February 4, 2015, Brown, Matthews, and Boston stood trial by jury before Judge Leon. The district court granted motions for judgment of acquittal as to certain counts, and the jury acquitted on certain other counts, including conspiracy (S.A.:505-11, 513, 515; J.A.:132-35). On March 24, 2015, the jury found Brown guilty of second-degree burglary while armed (D.C. Code §§ 22-801(b), -4502) (Count 6), PWID PCP (21 U.S.C. § 841(a)(1) & (b)(1)(C)) (Count 7), and possession of an unregistered firearm (UF) (second offense) (D.C. Code §§ 7-2502.01(a), -2507.06(2)(A)) (Count 10); Boston guilty of PWID PCP (Count 15); and Matthews guilty of unlawful

possession of a firearm and ammunition by a person previously convicted of a felony (FIP) (18 U.S.C. § 922(g)(1)) (Count 9) (J.A.:132-35).[1]

The district court sentenced appellants on September 1 (Brown and Matthews), 3 (Boston), and 29 (Adona), 2015, to terms of incarceration of 168 months (Brown), 108 months (Matthews), 96 months (Boston), and 108 months (Adona), followed by terms of supervised release (J.A.:267-84; D.E. 322). All four appellants noted timely appeals (D.E. 312; J.A.: 266, 265, 281). This Court consolidated the four appeals on April 10, 2017 (D. 1670407).

## The Boston, Matthews, and Brown Trial

### *The Government's Evidence*

They called it "Water World" (S.A.:70, 195).

On January 12, 2013, a resident of the Woodberry Village apartment complex in Southeast D.C. -- "Water World" -- walked in unannounced to the Metropolitan Police Department's ("MPD"'s) 7th

---

[1] As to Brown and Matthews, Count 23 of the indictment, employment of a minor under 14 years of age to violate drug laws, in violation of 21 U.S.C. § 861(a) & (d), was neither dismissed pre-trial nor submitted to the jury. Appellee will move separately in the district court to dismiss this count.

District ("7D") station and told a terrifying story: armed men had taken over his apartment and were using it to deal PCP, or "water" (S.A.:80-82, 84, 199-200, 467). Louis Edward Clifton -- "Steady Eddie"[2] -- told the police that he lived alone in a one-bedroom apartment in Woodberry Village and that armed men were currently at the apartment (S.A.:83-85, 89, 191).

After obtaining Clifton's consent and keys, MPD officers entered Clifton's apartment, Apartment 24 at 3235 23rd Street, S.E. (S.A.:88, 96). Brown, the apartment's sole occupant, was approximately 10-12 feet inside the residence and looked "very shocked and surprised" to see the police (S.A.:97-98). Brown "bladed" the left side of his body away from the entering officers, who went directly to Brown, placed him on a couch, and handcuffed him (S.A.:97-99). When the police stood Brown up, a black Lorcin .380-caliber handgun, loaded with six rounds in the magazine and

---

[2] In addition to "Steady Eddie," appellants and many witnesses in this case went by nicknames: "Goon" (Brown); "Bang," "Bangum," "Bang 2," or "Bain" (Matthews); "Trap," "Trapavelli," or "Quette" (Boston); "A-Town," or "A" (Adona); "Black" or "Blizz" (Levon Simmons); "Brell," "Skateboard," or "SB" (Hicks); "Coco," "Cocaine," or "Big Youngin" (Eddie); and "Nicki" (Monique Mathis) (S.A:154-55, 201, 248, 271-275, 277, 279-281, 316-22, 341, 351, 356-58, 390; 3/4/15 p.m. Tr. 36-37). We use last names here unless otherwise specified.

one spent shell casing in the chamber, lay in plain view on the couch; the gun was not there previously (S.A.:11, 99, 109-110, 126-27). In addition to the .380, the police found, under a love seat in the living room, an Uzi nine-millimeter assault weapon with 18 rounds in an extended magazine and a round chambered, and a .38-caliber Special revolver, loaded with five rounds (S.A.:11, 88-89, 114, 132-140). On a cabinet in the kitchen was a second magazine for the .380, loaded with seven rounds (S.A.:20, 118, 123). Additional loose .38-caliber ammunition and empty small zip-locks were tucked inside a black glove on the kitchen's top shelf (S.A.:11, 121-22).

The apartment smelled strongly of PCP -- a distinct chemical odor that the lead officer doubted anyone who smelled "would ever forget" (S.A.:79, 111). The police found nine glass vials with black screw-on tops, commonly used in the distribution of PCP through dipped cigarettes, or "dippers," and ranging in size from a half-ounce to four ounces, along with a four-ounce plastic "eye dropper" bottle (S.A.:51, 139-145, 296-97, 467-72). One of the half-ounce vials was full of PCP, two half-ounce vials were three-quarters full, and one of the one-ounce vials was three-quarters full, for a total weight of 44.4 grams of PCP (*id*.; S.A.:21, 416). All of the

bottles contained at least PCP residue and/or tobacco flakes (S.A.:139-145).

Clifton testified that at the end of December 2012, Brown accompanied by Matthews, pulled Clifton inside the foyer area of Clifton's building, grabbed him by the throat, and demanded a key and access to Clifton's apartment (S.A.165-66, 196-97). Clifton refused, the three "tussled," and Clifton ultimately broke free, and went to work (S.A.:167). Outside in Woodberry Village the following week, Brown pulled up his shirt to show Clifton the handle of a handgun and forced Clifton to go to the local convenience store to make a copy of his apartment door key (S.A.:168-69).

Brown used the new key to enter Clifton's apartment, and he promptly put two guns on the living room table (S.A.:170). In short order, Matthews came over, sat down, and started drinking and smoking synthetic marijuana ("K2") (S.A.:171). Clifton, who skipped work that night out of concern for leaving Brown and Matthews alone in the apartment, spent most of the night in his bedroom (S.A.:172). The next morning Brown, "as if he was showing off," showed Clifton a bag full of about 10 bottles of PCP (S.A.:172-74).

Brown proceeded to sell cigarettes dipped in PCP, called "dippers,"

out of Clifton's apartment (S.A.:175-76).  Clifton explained:

> [Brown] would receive a telephone call, go downstairs and
> either get a cigarette or he already had a cigarette or he would
> collect the money . . . . He came upstairs and . . . dipped the
> cigarette into the bottle of . . . PCP, and then . . . took the
> cigarette back downstairs and came back with the money.
> (S.A.:174-75.)

Clifton saw Brown with "hundreds of dollars" in the apartment, mostly

in $20 bills (S.A.:175). Matthews was also at the apartment "it seemed

like . . . every day . . . nonstop counting" money (*id.*).  Neither Brown nor

Matthews offered Clifton any money (S.A.:175, 176-A).

After the first night, Clifton retreated to his cousin's house to sleep,

but returned several times to his apartment during the day to "see what

was going on" (S.A.:177-78, 181). Brown and Matthews had taken over

and "trashed" the apartment, and had brought in guns, drugs, and liquor

(S.A.:179-80). Clifton saw Brown and Matthews drinking and smoking

in the apartment, and saw three guns -- including the Uzi -- along with

PCP, in the apartment (S.A.:178).[3]  After walking into 7D, Clifton

---

[3] Clifton knew both Brown and Matthews before the apartment takeover.
Brown and Matthews drank, smoked, shot dice, and sold PCP right in
front of Clifton's apartment building (S.A.:157-58). Clifton had personally

abandoned his apartment, leaving behind "furniture . . . clothes, everything" (S.A.:193-94).

The Clifton apartment raid pulled back the curtain on a broad drug-dealing culture inside Woodberry Village by a group that called itself "Little Mexico" (S.A.:2, 7-10, 71-72, 278-279, 329-330, 435-38). All four appellants were "Little Mexico" members, along with former co-defendant Breal Hicks and others (S.A.:267-275, 291, 339-342). After gaining access through either violence or other means, Little Mexico members would use apartments in Woodberry Village as "trap houses," used to store PCP and guns (S.A.:474-77). Adona was one of Little

---

witnessed Matthews selling high-grade marijuana (called "loud") and Brown selling PCP dippers on the street "too many times to count" (S.A.:159). Clifton had personally bought marijuana regularly from Brown for approximately two years leading up to January 2013, either on the street or in Clifton's apartment; "everyone" in the area knew that Brown sold marijuana (S.A.:151-53). Clifton had likewise bought marijuana on a few occasions from Matthews; the two had been to Clifton's apartment to facilitate drug transactions (S.A.:156). Clifton further admitted to using PCP and cocaine, and said he had bought PCP from Brown "seven or eight" times (S.A.:160-61). Clifton testified that his last use of PCP was approximately two to three years before appellants' trial, and that he had not used cocaine in approximately 10 years (S.A.:162-64). Clifton never saw either Brown or Matthews smoking PCP (S.A:187).

Mexico's main PCP suppliers; after collecting money from group members, Adona would leave, arriving later with "big bottles" of PCP, use a "dropper" to transfer the PCP to smaller bottles, and then divvy out the smaller bottles to the group (S.A. 336, 349-50, 446-49).[4] In turn, Brown, Matthews, and Boston all sold PCP dippers to end-users in and around Woodberry Village (S.A.:158-59 301-15, 364; 3/4/14 p.m. Tr. 40, 59).

A search of Brown's cell phone following his arrest led to Matthews; a search of Matthews's phone following *his* arrest[5] turned up evidence that Little Mexico was using Tiffany Williams's apartment as a trap house (S.A.:1-7, 117-18, 242-267). On March 23, 2013, the police executed a search warrant at 3245 23rd Street, S.E., Apartment 21 -- Williams's apartment -- in Woodberry Village (S.A:128, 283). Inside were Adona, Hicks, Williams, and Williams's six-year-old daughter, along with three partially full PCP vials in the kitchen cabinet, which together contained 29.4 grams of PCP, three handguns (a Glock .40 caliber loaded with 15

---

[4] Multiple witnesses also identified unindicted co-conspirator Levon Simmons as another source of PCP for the group (S.A:350, 357-58, 431).

[5] Matthews was arrested inside another Woodberry Village apartment, and had $880 in cash on him at the time (S.A.:259-60).

rounds in the magazine and one in the chamber, an H & K .40-caliber, loaded with 12 rounds in the magazine and one in the chamber, and a Thompson .45-caliber, loaded with six rounds), rubber gloves, and Everclear grain alcohol – a known "cutting agent" for PCP (S.A.:30-35, 284-289, 292-93, 478-79). Adona had $913 on him when he was arrested, and Hicks had $922 (S.A.:129-131).

The police arrested Williams along with Adona and Hicks (S.A.:240). Ultimately, Williams testified at length at appellants' trial pursuant to a cooperation agreement and described a situation that had rapidly spiraled out of her control with the group setting up shop and dealing PCP out of her apartment (S.A.:294; 2/26/15 Tr. 237).

In May of 2012, Williams, who was living in Woodberry Village with her three children (then 11, 7, and 5), became romantically involved with Hicks (S.A.:295). About four or five months into the relationship, Hicks -- whom Williams knew to be selling PCP – began to bring to Williams's apartment friends, including appellants, who would bring with them bottles of PCP (S.A.:298-99). Williams witnessed Brown, Matthews, and Boston selling PCP dippers outside, as well as in the common areas of her building (S.A.:311-15). Brown, Matthews, and Boston were all in

Williams's apartment on occasion, and Williams witnessed both Brown and Matthews receive phone calls inside her apartment, take bottles of PCP outside, then return inside (S.A.:331). Brown, Adona, and Matthews all kept PCP in Williams's kitchen cabinet, as did Levon Simmons and Breal Hicks (S.A.:332-35). Williams saw the group give money to Adona or Simmons, and saw Adona bring the "big bottles" of PCP into her apartment and apportion the PCP out to smaller bottles for the other members of the group (S.A.:336, 350). Williams explained that the group would mix Everclear or "Everfresh" with the PCP; she was present when Adona scolded the group for "cutting" the PCP too much and "running his customers away" (S.A.:337-38; 3/2/15 a.m. Tr. 54).

In addition to drugs, guns were a constant presence in Williams's apartment. Williams described seeing Brown, Matthews, Hicks, and Simmons handling the Uzi inside her apartment (2/26/15 Tr. 160; S.A.:36). Matthews brought a bulletproof vest into Williams's apartment (S.A.:359-63). On one occasion, Brown, after wondering aloud about how much pressure the Uzi's trigger required, accidentally shot a round into Williams's wall; the police found and photographed the bullet hole during their search (S.A.:53, 343-48). On another occasion, Simmons and an

11

individual Williams knew as "Sammy" pulled guns on each other in Williams's living room while all three of Williams's children were home (S.A.:352). Due to Williams's involvement with the group, she lost custody of her children, lost her belongings that had been in the apartment, and was "essentially homeless" for a period of time after being arrested and released (S.A.:365-67).

Williams also told the police about Conovia Eddie's Woodberry Village apartment (Apartment 13, 3255 23rd Street, S.E.), which, she understood, appellant Boston frequented (S.A.323-28; 3/3/15 a.m. Tr. 97-101). On April 26, 2013, the police executed a search warrant at Eddie's apartment (3/4/15 a.m. Tr. 104). The police had to use a battering ram to gain access, despite knocking and announcing themselves (S.A.:381-83; 385-88). Upon entering, the police smelled a "very, very strong smell" of PCP coming from the bathroom, "specifically the toilet, and the toilet was running" (S.A.:389).

Boston was the only person in Eddie's apartment and was arrested at the entranceway to the kitchen, just before the bathroom (S.A.:388). The police found a one-ounce glass vial full of PCP in a Halloween-type bag (along with candy) hanging from the door of a closet right inside the

apartment's front entrance (S.A.:39, 47, 396-97, 460-61). An empty half-ounce glass vial with PCP residue and tobacco flakes in it was inside the same closet (S.A.:40, 47, 398). An empty uncapped one-ounce glass vial, which smelled of PCP and had tobacco flakes in it, was in a garbage can in the kitchen; the lid was also in the can (S.A.:37, 47, 393-94). A box containing 200 pairs of hospital-type rubber gloves was in the hallway closet (S.A.:38, 394-95).

Boston had a key to the apartment in his pants pocket when he was arrested (S.A.:391-92). In addition to the drugs, the police recovered a bulletproof vest and a loaded .22-caliber pistol with an obliterated serial number; Boston's phone contained a photo of two more handguns that had been inside Eddie's apartment at some point, as well as a self-portrait with a handgun visible in Boston's waistband (S.A.:22, 41, 396, 398, 417-19; Gov. Exhs. 4(B)(3, 4)).

After Boston's arrest, jail calls led the police to Monique Mathis's apartment, in the same building as Williams's apartment (S.A.:399-401). Pursuant to a consent search, the police found .40-caliber and .9mm ammunition, shotgun shells, and drug paraphernalia (S.A.:402). Mathis, who was "compliant and helpful" to the investigation, knew all four

appellants and had seen all of them except Adona selling PCP either in the hallway of her building or outside in Woodberry Village (S.A.:402, 424-45). Like Williams, Mathis reported seeing Adona pouring PCP from larger bottles into smaller bottles (S.A.:446). On one occasion, Mathis held a handgun for Matthews and a shotgun for Boston, after Boston passed the shotgun through her window (S.A.:446(A-D)).[6] After Hicks, Adona, and Williams were arrested, Simmons came to Mathis's apartment and picked up PCP left by Hicks (S.A.:446(E-F)).

The government's fingerprint expert found Boston's palm print on one of the PCP vials -- containing residue and tobacco flakes -- recovered from Eddie's apartment (S.A.:412-22, 463-64). DNA evidence linked Brown to two guns and one magazine found in the Clifton apartment -- one of the guns to a certainty of one in two billion persons in the African-American population (S.A.:203-239, 369-72; 3/2/15 p.m. Tr. 51, 65). The magazine of the Glock handgun found in Williams's apartment had Adona's DNA on it to a certainty of one in 49 quadrillion (S.A.:373-79).

---

[6] Boston's phone contained a photograph of a shotgun (S.A.:412; Gov. Exh. 4 (B) (2)).

The government's drug expert explained, inter alia, that: (1) a one-ounce bottle of PCP would retail for between $400 and $500, and that street dealers would be "looking to double their money" to $800 to $1,000 by selling dipped cigarettes, or "dippers," out of the PCP vials; (2) PCP dealers use rubber gloves because PCP can be absorbed through the skin; (3) tobacco flakes "tend to fall out" into the glass vials when cigarettes are dipped in PCP for sale to users; and (4) possession of four-ounce, one-ounce, and half-ounce vials of PCP is inconsistent with personal use (S.A.:469-71, 473, 481).

The parties stipulated, inter alia, that: (1) Boston had a prior felony conviction for a crime of violence; (2) Matthews had been convicted of attempted ADW in D.C. Superior Court; (3) Brown had a prior Superior Court UF conviction; (4) Hicks and Adona both had felony convictions prior to January 11, 2013; (5) none of the appellants, nor Hicks, Williams, or Eddie, was licensed to carry any type of firearm in D.C.; (6) all of the firearms recovered in the case traveled in interstate commerce; and (7) the bulletproof vest found in Eddie's apartment had originally been purchased for the United States Marine Corps (S.A.:451-60).

15

### *The Defense Evidence*

#### 1.    Brown

Lasha Brown ("Lasha"), Brown's wife and the mother of his child, testified that the "Little Mexico" group name was taken from the Atlanta rap group the "Black Migo Gang" and that there was "nothing serious about it" (S.A.:482-90). Lasha had seen texts on Matthews's phone that she believed were not sent by Matthews (S.A:491). Lasha confirmed that Brown, Boston, and Matthews were all part of "Little Mexico" (S.A.:492).

Brown was on court-ordered GPS monitoring from March through July of 2012 (S.A.:496). Lawrence Daniel, a digital forensic examiner, interpreted some 58,000 GPS data points from Brown's GPS device during this time-period and explained that it was likely that at least some of the data points indicated that Brown was stationary inside Clifton's building (S.A:497-500). The parties stipulated that Brown tested positive for PCP in a urinalysis conducted shortly after his arrest in January 2013 (S.A:501).

#### 2.    Matthews

Jason Richardson lived in an apartment adjacent to Clifton's, testified that Clifton "seemed like a crackhead" and said that he had

16

smelled marijuana and PCP coming from Clifton's apartment (S.A.:494-95). Richardson knew Brown and Matthews and had seen Brown knocking on Clifton's apartment door to gain access (S.A.:495(A-B)).

### 3.    Boston

Boston read into the record a portion of a United States Probation Office report from the District of Maryland, which indicated that that office had supervised Boston from December 3, 2011, until his arrest on April 26, 2013, that Boston had been enrolled in an employment training program during that time period, and that he had reported to the probation office that he was living in an apartment in Suitland, Maryland (S.A.:502-03).

### SUMMARY OF ARGUMENT

Ample evidence supported Boston's PWID PCP conviction. Brown's jury instruction claims are either waived or do not constitute plain error, and his sentencing claim relies on a faulty factual premise. Adona's sentencing claims are likewise waived, and, at any rate, meritless. The district court correctly calculated Matthews's applicable sentencing guideline range and did not plainly err in explaining Matthews's sentence.

17

# ARGUMENT

## I. The Evidence Supported Boston's PWID PCP Conviction.

### A.    Standard of Review and Legal Principles

"[A]n appellant seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden." *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993). In considering sufficiency challenges, this Court reviews the evidence de novo, in the light most favorable to the government, and affirms a guilty verdict where "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wahl,* 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*)). This Court does "not distinguish between direct and circumstantial evidence, and [gives] 'full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006) (quoting *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999)).

To establish PWID PCP under 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), the government must prove:   "(1) knowing[] or intentional[] (2) possessi[on] of [PCP] (3) with the intent to distribute it." *Pollard v.*

18

*District of Columbia*, 191 F. Supp. 3d 58, 72 n.6 (D.D.C. 2016) (citing *United States v. Tobin*, 676 F.3d 1264, 1279-81 (11th Cir. 2012)).

Criminal possession of contraband may be actual or constructive. *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003) (citation omitted). To establish constructive possession, the government must show that "the defendant knew of, and was in a position to exercise dominion and control over, the [contraband]." *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (internal quotation omitted). Consequently, although "mere proximity" to contraband is insufficient to establish constructive possession, "evidence of some other factor -- including connection with [the contraband], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise -- coupled with proximity may suffice." *Alexander*, 331 F.3d at 127 (internal quotation omitted).

## B.    Discussion

There was sufficient evidence to support Boston's PWID PCP conviction. Police found Boston alone in an apartment that was strewn with PCP and drug paraphernalia. *See United States v. Brinson-Scott*, 714 F.3d 616, 624 (D.C. Cir. 2013) ("It is a fair inference that a defendant

exercises constructive possession over contraband found in a room he personally occupies."). Although, as Boston notes (at 5), proximity to contraband alone is insufficient to establish constructive possession, *see, e.g., Alexander*, 331 F.3d at 127, here, the government's evidence demonstrated much more than Boston's mere proximity to the PCP. Indeed, the jury reasonably could infer that Boston not only constructively but actually possessed PCP with the intent to distribute it.

First, Boston was not just a casual visitor to this apartment. Williams testified that he frequented the apartment (S.A.:324, 328). Moreover, Boston carried a key to the apartment (3/3/14 p.m. Tr. 30-31), which demonstrated that he had "dominion and control" over the premises. *See, e.g., United States v. Snow*, 462 F.3d 55, 70 (2d Cir. 2006) (defendant's possession of key to premises where contraband found supports findings of constructive possession); *see generally United States v. Long*, 905 F.2d 1572, 1577-78 (D.C. Cir. 1990) (person who exercises dominion and control over given premises constructively possesses contraband found on those premises).

20

Second, the evidence showed that Boston was engaged in PCP distribution. Williams saw Boston selling PCP in Woodberry Village in the interior common areas and outside her building (S.A.:295-97, 314-15). Similarly, Mathis witnessed Boston selling PCP in front of 3255 23rd Street, identified Boston as a member of "Little Mexico," with *inter alia*, Brown and Matthews, and explained that she had seen members of the group selling PCP in Woodberry Village (S.A.:435, 437-38).

Third, the circumstances of Boston's arrest provided powerful evidence of his knowing connection to the PCP in the apartment. The police had to use a battering ram to enter the apartment, despite knocking and announcing themselves (S.A.:381-83, 385-88). Upon entering, the police detected the strong and distinctive smell of PCP coming from the bathroom, and specifically the toilet, which was running (S.A.:389). The police arrested Boston, the only person in the apartment, at the entrance to the kitchen, just before the bathroom (S.A.:388). Viewed in the light most favorable to the government -- indeed, viewed in *any* light -- it was reasonable for the jury to infer that Boston had flushed PCP down the toilet after he realized the police were entering, demonstrating "consciousness of guilt." *United States v. James,* 764 F.2d

885, 889 (D.C. Cir. 1985) (finding consciousness-of-guilt evidence where, *inter alia*, defendant was the only person present in an apartment where "water [was] running into a jar that still contained flecks of illegal narcotics").

Fourth, the physical evidence from Eddie's apartment demonstrated that the apartment was being used as a base to deal PCP. This evidence included: (1) the full one-ounce vial of PCP in the Halloween bag on the closet-door handle; (2) the empty half-ounce vial with PCP residue and tobacco flakes inside the closet; (3) the empty one-ounce vial that smelled of PCP and contained tobacco flakes in the kitchen garbage can; and (4) some 200 pairs of rubber gloves in the hallway closet (S.A.:37-40, 47, 393-98, 460-61). The government's drug expert explained that all of this evidence was consistent with PCP distribution (S.A.:469-71, 473, 481).

Fifth, Boston's connection to multiple guns provided additional evidence on the PWID PCP count. In addition to the .22-caliber pistol and body armor found in Eddie's apartment, the police found photos of multiple firearms on Boston's phone, including a photo of Boston himself with a gun in his waistband, and a photo of a shotgun, which was

consistent with Mathis's testimony that Boston gave her a shotgun to hold (S.A.:22, 41, 396, 398, 407-11, 417-19; Gov. Exhs. 4(B)(3, 4)). As this Court has said many times, guns are essential tools of the drug trade. *See, e.g., United States v. Johnson*, 592 F.3d 164, 169 (D.C. Cir. 2010) ("We have recognized many times that 'drugs and guns go together'") (quoting *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991)).[7]

Finally, as Boston nearly concedes (at 7), forensic evidence sealed his fate on the PWID PCP count. Specifically, Boston's left palm print was on the empty glass vial with PCP residue and tobacco flakes found in the closet in Eddie's apartment (S.A.:421-22, 463-64). *See, e.g., United States v. Molinaro*, 877 F.2d 1341, 1344, 1349 (7th Cir. 1989) (fingerprint

---

[7] In the recent case of *Dorman v. United States*, --- F.3d --- , 2017 WL 2697979, at *4 (D.C. Cir. 2017), this Court found insufficient evidence that the defendant, who was not present at the time, constructively possessed drugs in a shared laundry room, despite his constructive possession of a gun in his bedroom. *Dorman* is easily distinguished. Here, Boston was present, there was evidence that he tried to destroy contraband, there was other evidence of his drug-trafficking activity, and, as discussed in the text, his palm print was on a vial containing PCP residue.

on bag containing cocaine "certainly suggest[ed]" that defendant *actually* possessed cocaine).[8]

## II.    Brown's Instructional Claims Are Waived or Otherwise Meritless.

### A.    Overall Standard of Review

A defendant's failure to object to jury instructions results in plain-error review by this Court. *See, e.g., United States v. (J.D.) Wheeler*, 525 F.3d 1254, 1256 (D.C. Cir. 2008); *see also* Fed. R. Crim. P. 30(d).

To prevail on plain-error review, a defendant must demonstrate (1) error (2) that is "plain," i.e., "clear" or "obvious," (3) affected substantial

---

[8] Boston's cited cases (at 5-6) offer him no shelter. To the contrary, *United States v. Dingle*, 114 F.3d 307 (D.C. Cir. 1997), counsels in favor of affirming Boston's PWID conviction. No witness saw Dingle dealing drugs (there, crack cocaine), nor was Dingle linked to the drugs via any forensics. Rather, similar to Boston's location next to the running toilet that reeked of PCP, this Court noted that Dingle's actions when the police knocked and announced their presence (yelling "wait a minute, wait a minute," while his co-defendant threw a large amount of drugs out the window) was sufficient, in conjunction with the other evidence, to support a PWID cocaine conviction. *Id.* at 309-12. *United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995), is inapposite, because Lucas had moved out of the apartment and had "no ongoing contact" with the premises for seven years before the police found guns and drugs there, and the fingerprint allegedly associating him with the drugs was 1) of unknown age; and 2) on a shoebox within which drugs were found, as opposed to, as here, actual drug paraphernalia itself. *Id.* at 957-58.

rights, i.e., "must have affected the outcome of the district court proceedings," and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-36 (1993).

### B.    Discussion

#### 1.    Brown's UF Instruction Claim

##### a.    Additional Background

Count 22 of the original indictment (Count 10 as ultimately submitted to the jury) charged Brown with violating D.C. Code §§ 7-2502.02, -2507.06[a](2)(A), possession of an unregistered firearm (second offense), by his possession of enumerated firearms "after having been previously convicted of possessing an unregistered firearm"(J.A.:88, 134).[9]

Before trial, the government proposed that the court inform the jury in its initial instructions that Brown was charged with possession of "one

---

[9] Brown incorrectly refers to the "second offense" aspect of this count as imposing a five-year mandatory minimum (Brown Brief at 21). In reality, D.C. Code § 7-2507.06(a)(2)(A) provides for a five-year statutory _maximum._ The district court ultimately imposed a sentence of 12 months of incarceration on the UF (second offense) count (D.E. 322 at 3).

or more firearms without a license, and having been previously convicted of unlawful possession of [a] firearm in the District of Columbia" (D.E. 209). At a pretrial hearing on February 2, 2015, Brown asked that the court insert the word "misdemeanor" before the term "unlawful" (S.A.:65-66).  At a later session on February 9, 2015 -- just before the court delivered its preliminary instructions to the jury -- Brown again requested that the court tell the jury that the prior conviction was a misdemeanor (S.A.:66(B-C)). In response, the prosecutor said:

> Your Honor . . . I want to make sure the record is clear, that there's an issue about whether or not the prior conviction of Mr. Brown would go to the jury or . . . stay with the Court. In other words . . . [this is] not a status offense, meaning a felon in possession. There's a question . . . whether or not [the prior conviction] goes to the jury or the Court. (S.A.:66-C.)

In response, Brown requested that the district court "take out the prior conviction" from the court's initial instructions to the jury (S.A.:66-C). While the court indicated that "on the face of the statute" it would appear that the prior conviction was an "element of the [UF] offense," the court acceded to the parties' requests and informed the jury simply that the indictment alleged that Brown had "possessed one or more firearms without a license" (S.A.:66 (D-F)).

26

During trial, the prosecutor read to the jury the following stipulation:

> The . . . parties in this case . . . hereby stipulate and agree that Dawayne Brown was previously convicted of possession of an unregistered firearm . . . on October 19, 2012, which is a misdemeanor (S.A.:457).

This stipulation resulted from a colloquy at the bench:

> [Prosecutor]:  Stipulation 3, Your Honor, is a prior conviction for the prior possession of a firearm.  And I thought . . . that was the one that we'd agreed to not be [put] to the jury but it was a stipulation agreed to by the parties.
>
> [cross-discussion of separate "Stipulation 5," to which Brown objected]
>
> Court:  So no objection to [Stipulation] 3?
>
> [Brown's counsel]:  Thank you.[10]
>
> Court:  Read [Stipulation] 3 and skip [Stipulation] 5.
>
> [Prosecutor]:  I understand. And just so the record is clear, the government had offered to have this not be given to the jury. Is this an issue that the jury is now going to have to decide? In other words, that [Brown] had a prior conviction for the unregistered firearm?

---

[10] The transcript erroneously refers to "Mr. Zucker" in some of the headings for the defense attorney speaking during the parties' discussions of the UF stipulation.  Mr. Jonathan Zucker represented Matthews in the district court (and represents him still before this Court). Mr. Steven McCool represented Brown in the district court. In context, it is clear that Mr. McCool was making the representations regarding the UF stipulation.

[Brown's counsel]:  Yes.  That's fine.

Court:  Okay.  So that's a jury question that the defense is asking that the jury answer?

[Brown's counsel]:  It's a jury question that's be stipulated to. To the extent it's an element of the offense, it's been stipulated to.

[Prosecutor]:  Correct. As I mentioned . . . some time ago . . . we think the conservative practice would be to not have that tried to the jury. But if Mr. McCool wants that, then that's what we'll do, and it's his invitation.

Court:  What's the elements?  Usually it's a prior convicted felony.  He's not, obviously, a felon.

[Prosecutor]:  So . . . the offense that he is being charged with . . . is possession of an unregistered firearm. That's an offense irrespective of whether you do or you don't have a conviction. The prior conviction makes the penalty instead of one year in prison, up to five years in prison. . . . . It is an element of the offense post [*Alleyne*],[11] but the D.C. Court of Appeals [has] at least suggest[ed] that's an issue for punishment for the Judge [to decide] rather than . . . the jury. . . . . We had offered, as a conservative practice, to not read it to the jury . . . . If Mr. McCool wants it to be decided by the jury, I'll read it to the jury, and I'm happy to do so.

[Brown's counsel]:  Read that issue now.  Read that to the jury and –

Court:  That's separate as to whether that's an element of the offense.

---

[11] The court reporter typed this case name as "*Eiland*" (S.A.:455). In context, it is apparent that the prosecutor was likely referring to the Supreme Court case of *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

28

> [Brown's counsel]:  We've entered that stipulation. It should
> be read to the jury.
>
> . . . .
>
> [Prosecutor]:  I mean, I'm sensitive to the area because . . . the
> [D.C.] Court of Appeals has mentioned possible issues, and I
> always am careful.
>
> [Brown's counsel]:  We're briefing that issue. Okay. We don't
> need to take the Court's time. We'd like that read to the jury.
> If it's not, we'll read it in our case.
>
> Court:  Read it.
>
> [Prosecutor]:  Yes, your Honor. (S.A.:454-57.)

After the close of the evidence, the district court had the following

exchange with Brown's counsel regarding the UF (second offense) jury

instruction:

> Court:  Possession of an unregistered firearm, second offense.
> Is this one okay, Mr. McCool, the way it's currently set?
>
> [Brown's counsel]:  Yes, sir. (S.A:520.)

Thereafter, the court instructed the jury as follows:

> Mr. Brown is charged with possessing . . . an unregistered
> firearm, after having been previously convicted of a
> misdemeanor, possession of an unregistered firearm.
> Specifically, Mr. Brown is charged with possessing [three
> separate firearms]. The elements of the offense of possession
> of an unregistered firearm, each of which the government
> must prove beyond a reasonable doubt, are as follows:
> Number one, the defendant possessed a firearm; two, he did
> so voluntarily and on purpose and not by mistake or accident;

three, the firearm . . . had not been registered to the defendant as required by District of Columbia law. . . . . The parties have stipulated that Mr. Brown has previously been convicted of a misdemeanor possession of an unregistered firearm. (S.A:530.)

### b.    Analysis

### i.    Brown's Claim Is Waived.

Brown invited both the district court's admission of the prior-conviction evidence and the court's ultimate UF jury instruction.[12] Brown repeatedly, and insistently, told the district court that he wanted the jury to be informed of his prior misdemeanor UF conviction, to the point of saying that if the prosecutor did not tell the jury about the prior conviction, he would do so (S.A.:457 ("We'd like [the stipulation] read to the jury.  If it [is] not, *we'll read it in our case.*") (emphasis supplied)). Moreover, Brown's insistence that the jury be told about his prior UF conviction was in response to the prosecutor's repeated offers to submit the prior-conviction issue to the district court only (S.A.:455). Consistent

---

[12] While the caption of Section II of Brown's brief takes issue with the district court's jury instructions regarding his prior misdemeanor UF conviction, the body of that section seems to challenge both the jury instructions and the district court's admission of the prior-conviction evidence (Brown Brief at 20, 20-23). At any rate, the two issues are of-a-piece, and the invited-error doctrine bars both claims.

with this position that the jury should hear about his prior misdemeanor conviction, Brown expressly approved the court's instruction, which referenced the stipulation that had been presented (S.A.:520). Having thus invited the court to allow the jury to hear about the prior conviction, Brown has waived any claim of error. *See, e.g., United States v. (Jacqueline) Wheeler*, 753 F.3d 200, 210 (D.C. Cir. 2014) (litigant may not "exploit an error on appeal that [he] invited the district court to commit"); *see also United States v. Harrison,* 103 F.3d 986, 992 (D.C. Cir. 1997) (finding invited error where defendant convinced district court not to inform the jury of his fugitive status or instruct on the issue of fugitivity but contended on appeal that district court had erred in failing to instruct that he was a fugitive; defendant's claim was a "classic example of attempted 'sandbagging'") (quoting *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977)).

### ii. Even if Not Waived, Brown's UF Claim Is Meritless.

Even if this Court reaches the merits of Brown's UF claim, he is entitled to no relief. Brown did not object either to reading aloud the stipulation about his prior UF conviction evidence or to the court's jury

31

instruction referencing that stipulation; therefore he is entitled, at most, to plain-error review. *See, e.g., (J.D.) Wheeler*, 525 F.3d at 1256 (jury instructions reviewed for plain error where no objection at trial); *United States v. McGill*, 815 F.3d 846, 882 (D.C. Cir. 2016) (where no trial objection to admissibility of evidence, this Court reviews for plain error) (citation omitted).[13]

Brown cannot show plain error. Regarding "error," because the UF (second offense) count at issue is a D.C. Code offense, this Court "defers to the D.C. Court of Appeals" (DCCA) on matters of law. *Williams v. Martinez*, 586 F.3d 995, 1001 (D.C. Cir. 2009) (citing *Blair-Bey v. Quick*, 151 F.3d 1036, 1050 (D.C. Cir. 1998) (explaining that this Court is "bound to follow interpretations of D.C. law by the D.C. Court of Appeals")).

While the DCCA has not passed on the precise question of the admissibility of a prior UF conviction in the context of a prosecution for UF (second offense), Brown correctly points to *Eady v. United States*, 44 A.3d 257 (D.C. 2012), as the most germane DCCA decision. *Eady* involved a prosecution for carrying a pistol (CP), UF, and unlawful possession of

---

[13] Brown concedes that plain error is the correct standard of review (Brown Brief at 20).

ammunition (UA), in violation of the D.C. Code. The then-applicable D.C. Code CP statute increased the possible penalty from five to 10 years of incarceration where a defendant had a prior conviction for either CP or for any other felony. *Id.* at 258 (citing D.C. Code § 22-4504(a)(2)). Eady had a prior felony and also had committed the offenses of CP, UF, and UA while on release from another case. *Id.* At Eady's trial, the trial court (1) read during voir dire an unredacted version of the indictment, which mentioned Eady's prior felony conviction and release status; (2) told the jury about the prior felony in its opening instructions to the jury; (3) admitted stipulations in the government's case that established Eady's prior felony conviction and release status; and (4) instructed the jury regarding the prior felony conviction and release status twice during its jury charge. *Id.* at 264-65. Additionally, the prosecutor mentioned the prior felony in both opening statement and closing argument, and read the stipulations to the jury in open court during the government's case. *Id.*

As the *Eady* court explained, the "trial court's reasoning was based on the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 [] (2000)," which held that any fact that "increases the maximum penalty

33

for a crime" must be submitted to a jury and proved beyond a reasonable doubt. *Eady*, 44 A.3d at 261. *Apprendi*, however, contained an exception to its general rule for proving prior convictions. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), *quoted in Eady*, 44 A.3d at 261. The DCCA found that the "drumbeat references to [Eady's] other crime undermined appellant's right to be presumed innocent" of the charged offenses, and amounted to plain error. *Eady*, 44 A.3d at 268.

Even assuming *arguendo* that informing the jury of Brown's prior UF conviction, in light of *Eady*, was (1) error, that was (2) clear or obvious, Brown's claim fails on both prongs three and four of the *Olano* plain-error test. *See Olano,* 507 U.S. at 732-36. Here, the presentation of Brown's prior UF conviction differed from *Eady* in several ways. First, the district court did not inform the jury of Brown's prior UF conviction in either voir dire or its opening instructions (2/9/15 a.m. Tr. 16). Second, while the jury -- at Brown's urging -- heard the stipulation regarding Brown's prior UF conviction, the prior conviction was but a passing

34

reference in the prosecutor's lengthy closing argument, as opposed to the lead-off fact in the *Eady* prosecutor's closing. *Compare* S.A.:522-23 *with Eady*, 44 A.3d at 264-65. Third, the *Eady* jury heard repeatedly that Eady had been convicted of a prior felony of unknown nature; Brown's jury heard that he had a prior *misdemeanor* UF conviction.

Moreover, unlike in *Eady*, the government's evidence that Brown possessed a firearm did not rise or fall on the credibility of one witness. *Compare Eady*, 44 A.3d at 268 ("the government's case hung on the credibility of Detective Battle, the only person who claimed to see [Eady] handle the gun"). Rather, in addition to the testimony of the police officers who described handcuffing Brown on a couch in Clifton's apartment, standing Brown up, and then finding a handgun on the couch (S.A.:18, 126-27), the government linked Brown via DNA to two separate guns and one magazine -- one of the guns to a certainty of 1 in two billion persons in the African-American population (S.A.:203-239, 367, 370-72; 3/2/15 p.m. Tr. 51, 65).  Thus, informing the jury of Brown's prior UF conviction did not "affect [Brown's] substantial rights," because even had the jury not been told about the prior conviction, the result of trial would not have changed. *See Olano*, 507 U.S. at 734.

Finally, because of the combination of the strong evidence of Brown's guilt and the relatively benign way in which the prior-conviction evidence was presented to Brown's jury, any error did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. *See also, e.g., United States v. Nouri*, 711 F.3d 129, 139-40 (2d Cir. 2013) (finding error in jury instructions that was plain, but upholding conviction because "overwhelming" evidence of guilt resulted in "no basis for concluding that the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings"); *Williams v. United States*, 137 A.3d 154, 163-66 (D.C. 2016) (citing *Eady* and finding that admission of stipulations to prior felony and release status constituted plain error, but affirming murder conviction because error did not affect substantial rights or seriously affect fairness, integrity, or public reputation of judicial proceedings). Indeed, it would cause a miscarriage of justice to reverse Brown's conviction after Brown had insisted on the jury hearing about his prior conviction.

## 2.  Brown's PWID PCP Special Unanimity Claim

### a.  Additional Background

Count 16 of the original indictment (Count 7 as ultimately submitted to the jury) charged Brown (along with Matthews, Adona, and Hicks), with unlawful possession with intent to distribute "a mixture or substance containing a detectible amount of phencyclidine," in violation of 21 U.S.C. 841(a)(1) & (b)(1)(C)) (J.A.:85, 133).

Before trial, Brown requested that the court provide the jury with the general instruction on unanimity (D.E. 180 at 3) (citing paragraph 2.405 of the Criminal Jury Instructions for the District of Columbia (5th ed. 2014)). At the end of trial, the court instructed the jury:

> And, finally . . . the verdicts in this case must represent the considered judgment of each juror. In order to return a verdict, each juror must agree on that verdict. Your verdict as to each count must be unanimous. (S.A.:531.)

On the PWID PCP count, the court instructed the jury, in pertinent part, that the elements the government was required to prove were that: (1) the defendant possessed a mixture and substance containing a detectable amount of . . . PCP, a Schedule II controlled substance"; (2) "the defendant possessed the [PCP] knowingly and intentionally"; and (3)

when the defendant possessed the PCP, "he had the specific intent to distribute it" (S.A.:528). The court added, "To establish the first element of the offense, the government must prove beyond a reasonable doubt that the defendant possessed with intent to distribute a detectable amount of . . . PCP. . ." (S.A.:529).

At no time did Brown request a special unanimity instruction on the PWID PCP count.

### b. Analysis

"Federal crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). Federal juries "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which several possible means the defendant used to commit an element of the crime." *Id.* at 817. Succinctly, while elements require unanimity, "jurors don't have to agree on means." *United States v. Schiro*, 679 F.3d 521, 533 (7th Cir. 2012).

The Supreme Court has provided the following example of the means/ elements distinction:

> Where, for example, an element of robbery is force or the
> threat of force, some jurors might conclude that the defendant

used a knife to create the threat of force; others might
conclude that he used a gun. But that disagreement -- a
disagreement about means -- would not matter as long as all
12 jurors unanimously concluded that the Government had
proved the necessary related element, namely, that the
defendant had threatened force.

*Richardson*, 526 U.S. at 817.

Brown cannot show that the district court's failure to provide the
jury with a special unanimity instruction on the PWID PCP count was
error at all, much less plain error.[14] Simply put, which "detectible
amount" of PCP the jurors found Brown possessed with the intent to
distribute was a *means*, or "brute fact," upon which they did not have to
agree, and not an element of the offense requiring unanimity.
*Richardson*, 526 U.S. at 817. Thus, to sustain a conviction for PWID a
"detectible amount" of drugs, the jury did not need to agree on which
drugs were at issue or on any particular amount, but just that Brown
possessed some detectible amount of PCP with the intent to distribute it.
S*ee, e.g., United States v. Mancuso*, 718 F.3d 780, 792-93 (9th Cir. 2013)
(rejecting need for special unanimity instruction in PWID cocaine case,
because "[i]t does not matter that different jurors may have found

---

[14] Brown concedes that plain error is the correct standard of review
(Brown Brief at 24).

different pieces of testimony credible, as long as the jury is unanimous on the bottom line conclusion that [the defendant] was guilty of [*inter alia*, possessing cocaine with the intent to distribute it]") (*citing Schad v. Arizona*, 501 U.S. 624, 631-32 (1991)); *United States v. Tolliver*, 454 F.3d 660, 669 (7th Cir. 2006) (in PWID cocaine case, jury not required to be unanimous on "specific amounts, transactions, or morsels" of drugs); *Horton v. United States*, 244 F.3d 546, 552 (7th Cir. 2001) (in PWID cocaine case, unanimity not required on whether cocaine at issue was powder or crack cocaine). *Cf. also, e.g.*, *United States v. Kayode*, 254 F.3d 204, 213-14 (D.C. Cir. 2001) (unanimity not required regarding which five allegedly false documents met elements of offense, because "all the jury was required to agree on was that the defendant had committed the offense as defined in the statute, not how the defendant had done so").

At any rate, even assuming *arguendo* that the district court erred by not giving a special unanimity instruction on the PWID PCP count, it was far from plain that the jury had to agree about the specific "detectible amount" of PCP that Brown possessed with the intent to distribute. Brown cites (at 24-26) no case from this Court or the Supreme Court that

supports his entitlement to a special unanimity instruction.[15] An error "ordinarily cannot be plain unless a clear precedent in the Supreme Court or this circuit establishes its erroneous character." *United States v. Hunt*, 843 F.3d 1022, 1029 (D.C. Cir. 2016) (internal quotation omitted).

Finally, even if clear or obvious, any alleged error neither "affect[ed] [Brown's] substantial rights," nor "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732-36. First, the evidence that Brown possessed PCP with the intent to distribute it was overwhelming. The police arrested Brown inside Clifton's apartment the same day that Clifton walked into the police station and reported the drug activity inside (S.A.:97). At the time of his

---

[15] In *United States v. Hubbard*, 889 F.2d 277 (D.C. Cir. 1989), this Court held, in a bank theft/fraud conspiracy prosecution, that the district court's failure to provide a special unanimity instruction regarding the overt act of the charged conspiracy count did *not* amount to plain error. *Id.* at 280. Similarly, in *United States v. Mangieri*, 694 F.2d 1270, 1280-81 (D.C. Cir. 1982), this Court, in finding no plain error in the district court's failure to provide a special unanimity instruction in a false statements case, described Mangieri's position that "when the government seeks to convict for one offense by proving two or more acts, proof of either one being sufficient, the court must, even in the absence of a request, instruct jurors that they must be unanimous in their finding that the government has proven the same one (or more) act(s)" as "*exceedingly difficult to accept.*" *Id.* at 1280 (emphasis supplied).

arrest, Brown was the apartment's sole occupant (S.A.:97-98). The police found evidence of PCP PWID and distribution throughout the apartment, to include: (1) multiple glass vials of varying levels of fullness -- some of which contained tobacco residue indicative of dippers -- totaling 44.4 grams of PCP; (2) multiple guns, magazines, and ammunition, including a handgun with Brown's DNA on it; and (3) a bottle of Everclear grain alcohol, a known "cutting" agent for PCP (S.A.:12-19, 97-120, 370, 416, 466, 473). Three eyewitnesses testified that they saw Brown selling PCP "dippers" in and around Woodberry Village (S.A.:158-59 (Clifton), 313-14 (Williams), 426-28 (Mathis)).[16]

Second, during his ultimately successful attack on the more serious PWID PCP conspiracy count, Brown's counsel conceded that Brown was guilty of the lesser PWID (detectible amount) PCP charge (S.A.:525: "You can stop the injustice of federal prosecutors trying to make a kingpin out of *a young man who's just a street dealer.  That's all he is*.") (emphasis supplied). Of course, a "street dealer" is guilty of possessing the drugs he

---

[16] To the extent Brown's contention (at 25) that the jury "did not credit" Clifton's testimony is even relevant here, that claim falls flat in the face of the jury's guilty verdict on the burglary count.

42

intends to distribute. In light of the government's PWID PCP evidence, and Brown's own concession of the point, it cannot be said that the lack of a special unanimity instruction either affected the outcome or "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 734, 736; *see, e.g., United States v. Cotton*, 535 U.S. 625, 632-33 (2002) (failure to allege drug weight in cocaine conspiracy case was clear and obvious error post-*Apprendi*, but claim failed on *Olano's* fourth prong).

### 3.    The    Second-Degree    Burglary Instruction

#### a.    Additional Background

Count 14 of the original indictment charged appellant Brown with the D.C. Code offense of first-degree burglary while armed, in violation of D.C. Code §§ 22-801(a), -4502, as follows:

> Between on or about January 7, 2013, and on or about January 12, 2013, within the District of Columbia, Dawayne Brown . . . while armed with a firearm, entered the dwelling of Louis Clifton, while Louis Clifton was inside that dwelling with intent to possess and distribute narcotics (J.A.:84).[17]

---

[17] Pretrial, the indictment was amended to charge second-degree burglary and thus omitted the words "while Louis Clifton was inside that dwelling" (D.E. 240).

During the conference on jury instructions at the end of trial, Brown

offered no objection to the court's proposed burglary instruction

(S.A.:516-19). Ultimately, the court instructed the jury as follows:

> The elements of the offense of burglary in the second degree,
> each of which the government must prove beyond a
> reasonable doubt, are as follows: Number one, the defendant
> entered the dwelling of another; number two, at the time of
> the entry, the defendant intended to use Mr. Clifton's
> apartment as a place to possess and store narcotics and
> weapons; and, three, at the time of the offense, the defendant
> was armed with a firearm. It's not necessary . . . that the
> defendant have actually committed the offense he intended to
> commit when he entered the premises. It's sufficient, if the
> government has proven beyond a reasonable doubt, that at
> the time the defendant entered the premises, he intended to
> commit a crime therein. In determining the defendant's intent
> at the time he allegedly entered, you may consider all the facts
> and circumstances in evidence, including the manner of entry
> and the acts . . . and events which occurred in the premises
> after the alleged entry. (S.A.:527.)

Again, Brown did not object.

### b.    Analysis

As a threshold matter, Brown misapprehends the standard of

review (Brown Brief at 17) (contending that his burglary claim is entitled

to de novo review). Because he did not press his objection to the burglary

instruction in the district court, Brown is entitled only to plain-error

review from this Court. *See, e.g., (J.D.) Wheeler*, 525 F.3d at 1256. He cannot satisfy the stringent plain-error standard.[18]

As with the UF claim, because the burglary charge is a D.C. Code offense, this Court looks to the DCCA for guidance on the substantive law. *See, e.g., Martinez*, 586 F.3d at 1001. That court has explained that "[a]n indictment charging burglary must specify the criminal offense that

---

[18] We note that the district court's jury instructions regarding the predicate offense for the burglary count differed slightly from the indicted offense (indictment: entered "with intent to possess and distribute narcotics" (J.A:125); instructions: entered "intend[ing] to use Mr. Clifton's apartment as a place to possess and store narcotics and weapons" (S.A.:527)). Brown has not raised any claim of error regarding the difference between the indictment and the jury instructions; as such, Brown has waived that issue. *See, e.g., United States v. Taylor*, 339 F.3d 973, 977 (D.C. Cir. 2003) (claims not raised in opening brief waived).

At any rate, had Brown briefed the issue, he would be entitled to plain-error review only, because he did not complain in the district court. Even assuming *arguendo* that the district court's variance from the indicted language was clear and obvious error, Brown can meet neither prong three nor prong four of *Olano*. *See, e.g., Portillo v. United States*, 62 A.3d 1243, 1259-60 (D.C. 2013) (finding that jury instruction that added second predicate crime to burglary count was clear error, but affirming on plain-error review based on *Olano* prongs three and four). As in *Portillo*, here, the jury convicted Brown both of PWID PCP and UF for a weapon found inside Clifton's apartment; these guilty findings were indicative that Brown had the requisite intent to commit criminal offenses when he entered the apartment. *Portillo*, 62 A.3d at 1259-60 ("Appellant was . . . convicted of theft and robbery, indicating that he had the intent to steal when he entered the . . . home").

the defendant intended to commit when entering a dwelling," *Portillo,* 62 A.3d at 1258 (internal quotation omitted), and that, correspondingly, a correct burglary jury instruction includes the requirement that the government prove that the defendant "had the specific intent to commit the [specified underlying offense]" at the time of the entry. *Bodrick v. United States*, 892 A.2d 1116, 1119 (D.C. 2006).

Even assuming *arguendo* that some aspect of the district court's burglary instruction was error, it was far from the plain error required for Brown to prevail. First, appellant's contention that the burglary instruction "on its face failed to inform the jury that they had to find that [Brown] entered the Clifton apartment with the intent to commit a criminal offense" (Brown Brief at 19) is incorrect. Immediately following the portion of the instruction on which appellant focuses, the district court told the jury that the government was required to prove "beyond a reasonable doubt, that at the time the defendant entered the premises, *he intended to commit a crime therein*" (S.A.:527) (emphasis supplied). As this Court has explained, when evaluating allegations of instructional error, the "paramount" principle is that the "instructions are to be

46

considered as a whole, rather than as isolated passages." *Mangieri*, 694 F.2d at 1280.

Second, it was not obvious, or even reasonable, that the district court's shorthand phrase of "possess[ing] and stor[ing] narcotics and weapons" could have referred to anything other than illegal activity. In the context of all the evidence of this case, it was clear that the court's references to "narcotics" and "weapons" did not pertain to legal possession of either narcotics pursuant to a prescription or lawfully registered firearms. To the contrary, there was not one scintilla of evidence in this lengthy trial that anyone possessed narcotics with a prescription, and all the appellants, including Brown, stipulated that they did not have licenses to possess firearms in the District of Columbia (S.A.:54-55, 458-59).

As to the intent required for the unlawful possession of narcotics and weapons, while the district court did not repeat these instructions in the context of the burglary instruction, the court had separately instructed the jury on the intent required for PWID PCP and UF within six transcript pages of the burglary instruction (S.A.:528-30). Thus, when read as a whole and in the context of this case, the district court's

47

burglary instructions did not amount to clear error. *See, e.g., United States v. Park*, 421 U.S. 658, 674 (1975) (jury instructions must be read "as part of the whole trial").

Brown's claim likewise fails on both *Olano's* third and fourth prongs. The jury convicted Brown of both PWID PCP and UF after hearing the government's evidence that Brown was arrested in Clifton's apartment with over $1,000 on him, virtually surrounded by PCP, and that his DNA was on multiple guns found in the apartment. There was no suggestion that Brown formulated the intent to commit those offenses only once he was inside. The verdicts thus indicate the jury's belief that Brown had the requisite intent to commit criminal offenses when he entered Clifton's apartment. Consequently, it cannot be said either that any error in the burglary jury instruction affected the outcome or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., Nelson v. United States*, 601 A. 2d 582, 595 (D.C. 1991) (separate jury guilty verdict on larceny meant jury necessarily found that defendant had requisite intent to steal required for burglary count, thus vitiating any harm from instructional error) (citing *Stewart v. United States*, 324 F.2d 443 (D.C. Cir. 1963)).

## III. Brown's Sentencing Claim Is Based on a Faulty Factual Premise.

### A. Additional Background

In its written presentencing submission, the government contended that, for guidelines purposes, the court should hold Brown responsible for the distribution and/or PWID of between 100 and 400 grams of PCP, with a corresponding base-offense level of 24 (D.E. 266 at 2, 11). Brown countered that he was accountable only for an unspecified amount of PCP, or "at most" for 47.2 grams (D.E.s 267, 278 at 5).

On July 2, 2015, Brown's PSR writer calculated that Brown was responsible for 76.6 grams of PCP, with a corresponding base-offense level of 20 (Brown PSR at 12).[19] The PSR writer explained:

---

[19] Although the base-offense level reported in bold following paragraph 43 of the PSR is "20," the text of paragraph 43 reports that the base offense is "18" (Brown PSR at 12). Pursuant to § 2D1.1(c)(10) of the 2014 guidelines, the base-offense level for the 76.6 grams of PCP found by PSR writer is 20. It was evident, therefore, that the reference to level 18 was a mistake. The undersigned AUSA proffers that he spoke with the PSR writer USPO Sherry Brandon on July 5, 2017, and Ms. Brandon confirmed that the "18" was a typographical error, and the correct base offense level per the PSR was 20.

> During the trial proceedings, Ms. Williams and Mr. Clifton testified that Mr. Brown stored drugs at their apartments, where a total of 76.6 grams of PCP was recovered during the search warrants executed between January and April 2013. Mr. Brown is accountable for the 76.6 grams of PCP resulting in a base offense level of 20 . . . . If the Court determines that the drug quantity is between 100 to 400 grams of PCP, the base offense level would be 24. (Brown PSR at 30.)

On July 20, 2015, the district court held a hearing to determine Brown's guidelines range and heard argument by the parties (S.A.:536-61). The court indicated it would apply certain enhancements, but it deferred a decision on base-offense level (S.A.:561(A-C)). At another presentencing hearing on July 28, 2015, the district court announced its findings regarding Brown's applicable guidelines range for the PWID PCP count:

> *Using the . . . 20 base[-offense level]* probation came up with . . . I'm adding two points for possession of a firearm under [U.S.S.G. §] 2D1.1. 2 [points] for use of violence [pursuant] to § 2D1.1(b)(2). 2 [points] for use of premises. 2 [points] for use of children under age of 18. And then 2 points for acceptance of responsibility, I'll take it off, which gets us down to a 26, which is 78 to 97 months. (S.A.:563; emphasis supplied.)

At sentencing, the district court found that "the guideline sentence" was appropriate for the PWID PCP count and thus sentenced Brown "at the high end, 96 months," along with consecutive sentences of 60 months

50

and 12 months for the burglary and UF counts, respectively, for an aggregate sentence of 168 months (S.A.:565-67).

## B.  Discussion

Brown's sentencing challenge rests on a faulty factual premise. Brown contends (at 28) that the district court erred when it "made a factual finding that 100 to 400 grams of PCP could be attributed to" him for guidelines purposes. The district court made no such finding. Rather, the court agreed with the PSR writer that Brown was responsible for 76.6 grams of PCP with a corresponding base-offense level of 20 (S.A.:563). Indeed, if the court had found 100 grams or more of PCP, Brown's 96-month sentence would not have been "the guideline sentence" the court expressly imposed

(S.A.:565).[20] Accordingly, Brown's only challenge to his sentence is

unfounded.[21]

_____

[20] Had the court found the PCP quantity to exceed 100 grams, the base offense level would have been 24. U.S.S.G. § 2D1.1(c)(8). With the various adjustments, which added eight points and subtracted two, the adjusted offense level would have been 30, and with Brown's category III criminal history, his guidelines range would have been 121-151 months. *See* U.S.S.G. Chapter Five (Sentencing Table).

[21] Brown does not argue that the court erred in finding only 76.6 grams, and thus he has waived such a claim on appeal. *See, e.g., Taylor*, 339 F.3d at 977. In any event, the district court did not err in attributing 76.6 grams to Brown. Searches of Clifton's and Williams's apartments yielded 44.4 and 29.4 grams, respectively, for a total of 73.8 grams (S.A.:416, 478-79). Brown's PSR writer attributed an additional 2.8 grams of PCP to Williams's apartment from a separate search (Brown's PSR at 10). This appears to be a reference to 2.5 grams of PCP recovered by the police on the day of Matthews's arrest – March 7, 2013 – either in or "adjacent to" the apartment where Matthews was arrested (S.A.:42, 265). At any rate, any error in the addition of the 2.8 grams was harmless for guidelines purposes. See U.S.S.G. § 2D1.1(c)(10) (setting base-offense level of 20 for range of 60-80 grams of PCP). The fact that Brown was arrested before the search of Williams's apartment did not require the court to ignore the drugs found there. There was ample evidence that Brown was part of an ongoing PCP conspiracy, and he did not withdraw from that conspiracy after his arrest; in fact, he made calls from the jail trying to influence others to "fuck . . . up" Clifton (S.A.:353-54). *See United States v. Wilson,* 605 F.3d 985, 1036-37 (D.C. Cir. 2010) (upholding attribution of drugs to co-conspirator who was incarcerated during part of on-going PCP distribution conspiracy); *United States v. Massino*, 546 F.3d 123, 136 (2d Cir. 2008) (incarceration does not create presumption

## IV. Adona Waived his Sentencing Claims, Which Are Meritless.

### A. Additional Background

### 1. Adona's Plea Agreement

Per a plea agreement filed on November 5, 2014, Adona agreed to plead guilty to conspiracy to distribute and possess PCP, and further agreed to plead guilty separately to attempted ADW in D.C. Superior Court case number 2013-CF3-3966 (J.A.:102). Adona agreed to the correctness of a factual proffer, filed by the government the same day, which encompassed both the federal conspiracy charge and the D.C. Code charge (J.A.:99-102).

In the proffer, Adona agreed that, between May 2012 and April 26, 2013, he conspired with others, including Matthews, Boston, and Brown, to distribute PCP in Woodberry Village (J.A.:99). As to the attempted ADW charge, Adona admitted that, on April 30, 2012, he had shot a man

---

of withdrawal from conspiracy). Nor does it matter that the jury acquitted Brown of conspiracy, since the court had to find drug quantity only by a preponderance of the evidence. *See United States v. Mack*, 841 F.3d 514, 527 (D.C. Cir. 2016); *see also United States v. Smith*, 741 F.3d 1211 (11th Cir. 2013) (upholding consideration of acquitted conduct in context of drug-weight calculation at sentencing).

named Karl Carrington in the back during a marijuana transaction at 3418 13th Place, S.E. – a location not within Woodbery Village, although Adona's dispute with Carrington arose from an earlier altercation near 23rd Street, S.E. (J.A.:100). On May 23, 2012, the police searched 3418 13th Place, S.E., pursuant to a warrant and found Adona there with a key to the apartment and $1,830 in cash on his person (*id.*). The police also recovered a handgun, marijuana and crack cocaine, ammunition, and a digital scale with Adona's fingerprint on it, along with cocaine residue (J.A.:100-01).

The parties agreed that Adona was accountable for between 100 and 400 grams of PCP, which was either possessed with the intent to distribute or actually distributed by either Adona or his co-conspirators (J.A.:103-04). The plea agreement further stated:

> The parties agree that the following Sentencing Guidelines sections may apply:

| | | |
|---|---|---|
| U.S.S.G. § 2D1.1 | Base Offense Level | **26** |
| U.S.S.G. § 2D1.1(b)(12) | Use of premises | +2 |
| U.S.S.G. § 2D1.1(b)(2) | Use of Violence | +2 |
| U.S.S.G. § 3B1.4 | Use of Children | +2 |
| U.S.S.G. § 2D1.1(b)(1) | Weapon | +2 |

Total                    **34**

(J.A.:104).

The government agreed to a three-level reduction for acceptance of responsibility and timely notice of the plea, for a total estimated offense level of 31 (*id.*). With a criminal-history category of III, the parties estimated that Adona's federal sentencing guideline range would be 135-168 months, and they agreed that a sentence within that range "would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a)" (J.A.:105-06).[22]

The agreement also included an appeal waiver, as follows:

> Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client agrees to waive the right to appeal the sentence in this case, including any term of imprisonment, fine, forfeiture, award of restitution, term of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court, in which case your client would have the right to appeal the illegal sentence or above-guidelines sentence, but not to raise on appeal other issues regarding the sentencing. In agreeing to this waiver,

---

[22] The parties agreed not to seek either a downward or an upward departure from the applicable guideline range, but they reserved the right to seek a variance either above or below the estimated guideline range "based on § 3553(a) factors" (J.A.:105-06).

your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement (J.A.:108.)

## 2. The District Court Plea Hearing

The district court accepted Adona's guilty plea, per the written plea agreement, at a hearing on November 5, 2014 (S.A.:56(F-G)). After discussing possible sentence, the court said to Adona:

> Now, with regard to certain circumstances, you may even have an opportunity, the right to appeal the sentence of this court on the grounds of reasonableness. Do you understand that?

(S.A.:56-H.) Adona replied, "Yes, sir" (*id.*). Later in the proceeding, Adona's counsel noted that the court had indicated at previous hearings that it would likely depart upward from the sentencing guidelines, and counsel construed the court's appeal-waiver discussion with Adona as follows:

> I've explained to Mr. Adona, and I think Your Honor just went over briefly with him earlier, that under the plea agreement he retains the right to appeal [an above-guidelines sentence] . . . if Your Honor does that.

(S.A.:56-J).[23] Adona confirmed that his understanding of the plea agreement was "consistent with" his trial counsel's recitation (S.A.:56 (J-K)).

As to the separate Superior Court attempted ADW charge, Adona, through counsel, agreed that he would be sentenced first in Superior Court and then in district court, with Adona's counsel noting that the sequencing of the two pleas "was the essential procedural part of the agreement" (S.A.:56-I).

Adona agreed that the factual proffer was a "fair and accurate description" of his conduct (S.A.:56(L-S). The court accepted Adona's plea (S.A.:56-T).

### 3.    The    Superior    Court Attempted ADW Case

Adona pleaded guilty to attempted ADW before the Honorable Patricia Broderick on October 29, 2014 (J.A.:295). Judge Broderick

---

[23] At an earlier status hearing when it was considering whether to accept the parties' plea agreement, the court noted that Adona's estimated guidelines range was "not proportionate to the seriousness of [Adona's] conduct" and that Adona should "know going in, that there is not much, if any, likelihood that there will be a sentence from this Court within the guideline range" (10/7/14 Tr. 5-6).

explained to Adona that: (1) his Superior Court plea was linked to his district court conspiracy plea; and (2) his Superior Court voluntary guidelines range would likely be 10-28 months (J.A.:294-98). The prosecutor read the same proffer of facts as in the district court case, and Adona admitted that he had shot Carrington with a firearm (J.A.:300-06). Judge Broderick accepted Adona's plea (J.A.:311-12).

Judge Broderick sentenced Adona to 28 months of incarceration on January 30, 2015 (J.A.:327-44). Although Adona was represented by Mr. Billy Ponds in the Superior Court case, his district court trial counsel, Mr. Thomas Abbenante, also appeared at Adona's Superior Court sentencing (J.A.:327). Regarding Adona's pending district court sentencing, the prosecutor told Judge Broderick that if Judge Leon were to sentence Adona to an above-guidelines sentence, then Adona would retain the right to appeal his sentence (J.A.:334-35). Mr. Abbenante represented that Judge Leon had made it "abundantly clear" that he was planning to depart upward (J.A.:336).[24]

---

[24] The Superior Court transcript lists the counsel making this comment as "Mr. Ponds" (J.A.:336). In context, it is clear that it was Mr. Abbenante (referred to by the Superior Court transcript as "Mr. Abernathy") who was making representations about the pending district court sentencing.

The Superior Court prosecutor -- the same prosecutor who handled the district court case -- agreed that the "likelihood that [Judge Leon will] go above the guidelines is high" (J.A.:341).

### 4.     The     District     Court     Presentence     Report

Adona's presentence report (PSR) calculated his total offense level as 25 and his criminal-history score as six, resulting in a criminal history category of III, with a corresponding guideline range of 70-87 months of imprisonment (J.A.:552-60 (sealed)).[25] The PSR included in its total offense-level calculation a two-point increase pursuant to U.S.S.G. § 2D1.1(b)(2) for use of violence, based on Adona's shooting Carrington in the back (J.A.:552 (sealed)). Relatedly, the PSR writer did not include the

---

[25] This six-point difference between the PSR's calculation of offense level (25) and the parties' calculation (31) was due to several factors:  (1) the PSR calculated the base-offense level as 24 (J.A.:552 (sealed), and the parties calculated it as 26 (J.A. 104); and (2) the PSR did not include a two-point increase for the use of premises for drug trafficking, pursuant to U.S.S.G. § 2D1.1(b)(12), or a two-point increase for using a minor to commit a crime, pursuant to U.S.S.G. § 3B1.4 (J.A.:104, 552 (sealed), 565-66 (sealed)). The reduction in the base-offense level from 26 to 24 was a result of a difference between the 2013 and 2014 Federal Sentencing Guidelines. Here, unless otherwise specified, guidelines references are to the 2014 Sentencing Guidelines.

Superior Court conviction in Adona's criminal-history score calculation (J.A.:553-57 (sealed)).

The PSR also twice noted that under the plea agreement, Adona had waived his right to appeal his sentence unless it exceeded the statutory maximum or guideline range (J.A.:546, 561 (sealed)). Adona did not note any objections to the PSR (J.A.:566 (sealed)).

## 5.    The Presentencing Hearing

The district court held a presentencing hearing to determine the correct guideline range (S.A.:561-E). The court noted that it had "the option" of running the federal sentence consecutively to the D.C. attempted ADW sentence (S.A.:561-G). Adona acknowledged that he had not objected to the two-point increase for "use of violence" pursuant to § 2D1.1(b)(2) and that the only enhancement in dispute was the two-point increase for use of premises (7/28/15 Tr. 24). Adona nonetheless asked the court to "take into consideration" the fact that the Superior Court judge previously had sentenced him to 28 months of incarceration, and he suggested that he would be "punished twice" unless the court ordered that the portion of the federal sentence attributable to the use-of-violence enhancement run concurrently with the attempted ADW sentence

60

(7/28/15 Tr. 34-35). The district court ultimately found that Adona's adjusted offense level was 27 and his guideline range was 87 to 108 months (J.A.:35-42).[26]

## 6. The District Court Sentencing Hearing

At Adona's district court sentencing, the prosecutor asked that the federal sentence run consecutively to the Superior Court attempted ADW case (S.A.:571-A). Adona "acknowledge[d] that the Guidelines Range that the Court has determined in this case [87-108 months] [was] appropriate," and noted that he was "not going to argue otherwise" (S.A.:573). Ultimately, Adona requested that the court run any portion of its sentence that was attributable to the two-point use-of-violence enhancement concurrently with the Superior Court sentence (S.A.:574). Adona's counsel explained: "[I]f [Adona] had not gotten the two points for [the Carrington shooting], his guidelines would have been . . . 87 months, the max. And . . . the difference between 87 and 108 is 21 months

---

[26] The court started with a base offense level of 24, added two points each for use of premises (§ 2D1.1(b)(12)), violence (§ 2D1.1(b)(2)), and weapons (§ 2D1.1(b)(1)), and subtracted three points for acceptance of responsibility (7/28/15 Tr. 31, 36, 41). Adona's criminal history remained at category III.

. . . . If [the court] goes to the high end of the guidelines . . . the Carrington case impacted him 21 months." (S.A.:575-76.)

Despite its earlier warnings, the district court did not depart upward. Instead, finding that a sentence "at the high end of the range" and a "long period of supervision" were appropriate, the district court sentenced Adona to 108 months of confinement, to be followed by 96 months of supervised release (S.A.:579). The court explained that Adona's conspiracy offense represented "very serious" conduct that was "very dangerous" to the community; that "just punishment [was] necessary" because the community had been "ravaged . . . by drug sales and by the danger of the violence in that area"; that the sentence needed to deter appellant and others who might be attracted to the drug trade; that Adona had a "track record of involvement with guns and drugs"; and that Adona's commission of the offense while on probation was "an affront" to the judicial system (S.A.:577-79). The court ordered that the conspiracy sentence would run consecutively to the Superior Court sentence because the attempted ADW was a "separate crime," although the court acknowledged "commonality" in that the offenses both "relate[d] to guns and drugs" (S.A.:574, 578, 580).

At the close of Adona's sentencing proceeding, the district court said

the following regarding Adona's appeal rights:

> Pursuant to 18 U.S. Code 3742, you have a right . . . to appeal
> the sentence of the Court, consistent with the terms and
> conditions of the plea agreement.  Now, those were limited.
> And I believe since it's a Guideline-Range sentence, it's . . . not
> appealable, but I'll leave that to your counsel, your very able
> counsel, to figure that out.  But if you're going to appeal and
> if you have a right to under the terms of the plea agreement,
> then you must do so within 14 days.  (S.A.:579-A.)

## B.    Discussion

### 1.  Adona's Claims Are Waived.

In the written plea agreement, Adona agreed to waive his right to

appeal his sentence unless the sentence was above the guideline range or

the statutory maximum (J.A.:108). The 108-month sentence here was

within the guidelines range of 87 to 108 months, which Adona's counsel

twice confirmed was the correct range (S.A.:561-M, 573). The sentence

also was below the statutory maximum of 20 years. *See* 21 U.S.C. §§ 846,

841(b)(1)(C). Adona thus waived his right to challenge his sentence. And

because that waiver was "knowing, intelligent, and voluntary," *United

States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009), this Court should

enforce it and dismiss Adona's appeal. *See, e.g., id.* 528-30 (enforcing

appeal waiver and dismissing appeal where waiver substantially

identical in pertinent part to Adona's); *United States v. Adams*, 780 F.3d 1182, 1183-84 (D.C. Cir. 2015) (same).

Indeed, fairness demands that Adona be held to his promise to give up his appeal rights. Adona received substantial benefits from his plea agreement, including a three-year cap on a potential 30-year violent offense in Superior Court and the dismissal of all but one of the 23 indicted counts he faced in district court (J.A.:6=561 (J-K); 9/29/15 Tr. 30; J.A.:72-98). Adona's appeal waiver was part of the government's benefit of this bargain. As this Court has explained, appeal waivers "lose [their] value as bargaining chip[s]" for defendants if not enforced "in the "mine run of cases," where enforcement of the waiver would "not work a miscarriage of justice." *Adams*, 780 F.3d at 1184.

The district court's comment at the plea hearing suggesting that Adona could appeal the sentence "on the grounds of reasonableness" (S.A.:56-H) does not undermine the validity of Adona's appeal waiver. During the same plea colloquy, Adona's counsel clarified the district court's remarks by noting that the court's stated "inclination was that [it] . . . would probably depart upward" from the guidelines, and that, "under the plea agreement [Adona] retains the right to appeal" such an above-

guidelines sentence (S.A.:56-J). Adona agreed with his counsel's representation that he "retain[ed] the right to appeal" if the district court sentenced him to an above-guidelines sentence (S.A.:56 (J-K). At no point in the plea hearing did Adona suggest that he thought he could appeal a within-guidelines sentence that was below the statutory maximum. Nor did he or his counsel challenge the statements by (1) the prosecutor at the Superior Court sentencing that Adona retained the right to appeal if, as the parties expected, Judge Leon departed upward from the guidelines (J.A.:334-36, 341); (2) the PSR writer that Adona had waived the right to appeal unless the sentence exceeded the statutory maximum or guideline range (J.A.:545, 561, 564 (sealed)); or (3) the district court at sentencing that Adona's sentence was "not appealable" because it was within the guidelines (J.A.:579-A). Read as a whole, the record confirms that everyone understood that, in accordance with the plain language of the plea agreement, Adona had waived the right to appeal a within-guidelines sentence.[27] This Court thus should enforce the appeal waiver and reject Adona's appeal.

---

[27] This case is distinguishable from those cases where district courts have invalidated otherwise valid appeal waivers by misleading defendants

## 2.    Even if Considered, Adona's Claims Are Meritless.

Even assuming *arguendo* Adona can escape his appeal waiver, his claims warrant no relief. Adona argues that the district court either (1) punished him twice by refusing to run a portion of his district court sentence concurrently with his Superior Court sentence (Adona Brief at 16-20), or (2) improperly varied upward from the guideline range (*id.* at 21-25). These claims fail.

---

about the parameters of the waiver.  *See, e.g., United States v. Kaufman*, 791 F.3d 86, 88 (D.C. Cir. 2015) (district court said during plea colloquy that defendant would "still have the right to appeal the sentence if [he] believe[d] the sentence is illegal," and, later, that the defendant would have the right to appeal under some circumstances if he did not "like" the sentence) (alterations in *Kaufman*); *United States v. Godoy*, 706 F.3d 493, 495 (D.C. Cir. 2013) (district court told defendant he retained appeal rights if he believed the district court "ha[d] done *something illegal*, such as imposing a period of imprisonment longer than the statutory maximum" (emphasis in *Godoy*)). Here, Adona's own counsel clarified any ambiguity in the court's reference to an appeal "on the grounds of reasonableness" by noting that Adona would retain the right to appeal only if the district court sentenced him to an above-guidelines sentence. Thus, unlike in cases like *Kaufman* or *Godoy*, there was no confusion at the time of the plea hearing about the scope of the defendant's appeal waiver.

### a. The District Court Was Not Required to Order Partially Concurrent Service of Adona's Sentences.

Adona's challenge to the consecutive nature of his sentence in this case is without merit. The district court had discretion to order that the federal sentence run consecutively to the D.C. sentence. 18 U.S.C. § 3584(a) ("[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . . ."); *Setser v. United States*, 566 U.S. 231, 235-37 (2012) (recognizing sentencing judge's discretion to order consecutive sentences). The district court recognized its discretion (7/28/15 Tr. 8 (noting "the option" of imposing consecutive sentences)) and chose to make the entire federal sentence run consecutively to the D.C. sentence.

Adona fails to show that this choice amounted to an abuse of discretion. The decision whether to impose consecutive or concurrent sentences is governed by the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3584(b). Given the court's stated concerns about the seriousness and dangerousness of Adona's criminal conduct, his "track record of involvement with guns and drugs," and the need for just

67

punishment and deterrence (J.A.:577-79), imposition of consecutive sentences was consistent with the § 3553(a) factors.[28]

We recognize that among the § 3553(a) factors the court was required to consider was the guidelines, *see* § 3553(a)(4), and that U.S.S.G. § 5G1.3(b) requires a sentencing court to adjust the sentence to take into account a term of imprisonment resulting from a prior offense that is deemed relevant conduct for the instant offense. *See United States v. Heard*, 359 F.3d 544, 549-51 (D.C. Cir. 2004). Specifically, the court must (1) "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment" if the court determines that the Bureau of Prisons will not credit that term to the federal sentence, and (2) run the new sentence concurrently with the

---

[28] None of the "double-counting" cases cited by Adona (at 17-18) is relevant. Both *United States v. Farrow*, 198 F.3d 179, 193-94 (6th Cir. 1999), and *United States v. Kenney*, 283 F.3d 934, 938 (8th Cir. 2002), addressed double-counting *within* a federal sentence, *i.e.*, where the same conduct is considered twice in determining the guideline range. Neither case considered imposition of a federal sentence after a state sentence. *United States v. Szakacs*, 212 F.3d 344 (7th Cir. 2000), involved the enhancement under U.S.S.G. § 2K2.1(b)(5) for possession of a firearm in connection with "another" felony offense, which in that case was a state offense that was "essentially the same crime" as the federal crime of conviction. *Szakacs* did not address the issue of consecutive/concurrent sentences for different offenses.

remainder of the undischarged term of imprisonment. § 5G1.3(b)(1) and (2). Adona, however, has not raised a claim of error under § 5G1.3(b) or even mentioned § 5G1.3 in his brief. He thus he has waived any claim that the district court erred in not applying that guideline. *See*, *e.g.*, *United States v. Taylor*, 339 F.3d 973, 977 (D.C. Cir. 2003) (defendant waived claim he failed to include in opening brief).

Even if reviewable, any claim of § 5G1.3 error would not entitle Adona to relief. In the district court, Adona never cited this guideline -- or any authority -- for concurrent sentences but simply argued that such a result would be "fair" (J.A.:576). Adona thus did not preserve a claim that the court should have followed § 5G1.3, and any such claim on appeal would be reviewed for plain error affecting substantial rights. *See Al Bahlul v. United States*, 767 F.3d 1, 9 (D.C. Cir. 2014) (to preserve objection, party must state ground for objection "with sufficient precision to indicate distinctly [his] thesis") (internal quotation omitted); Fed. R. Crim. P. 52(b). Adona could not meet the plain-error standard.

Even if the district court procedurally erred in not considering § 5G1.3 and that error was obvious, Adona could not sustain his burden of showing prejudice. Because the federal sentencing guidelines are

"effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), a sentencing judge "has no obligation to impose a concurrent sentence, even if § 5G1.3(b) applies." *United States v. Nania*, 724 F.3d 824, 830 (7th Cir. 2013); *accord*, *e.g.*, *United States v. Singletary*, __ Fed. App'x __, 2017 WL 1437227, at *1 (4th Cir. 2017).[29] Here, the district court made clear that it believed Adona merited a lengthy, and consecutive, term of imprisonment for this drug conspiracy, which it viewed as a crime "separate" from the attempted ADW (S.A.:574, 578). Adona could not show that, had the court expressly considered § 5D1.3(b), it would have run part of the federal sentence concurrently instead. Adona also could not establish that upholding his sentence would seriously undermine the fairness, integrity, or public reputation of judicial proceedings. His 28-month sentence for shooting Carrington in the back was relatively light, and he benefited from the plea agreement, which protected him from a far greater sentence in Superior Court and a higher criminal history in the district court. Notwithstanding § 5G1.3(b), therefore, the district

---

[29] This Court decided *Heard* a year before *Booker* and thus did not have occasion to consider § 5G1.3(b) in an advisory guidelines regime.

court's decision to impose a consecutive sentence does not warrant reversal.[30]

### b. The District Court Did Not Impermissibly Vary Upward

Adona's alternative arguments – that the court either erred in applying the § 2B1.1(b)(2) enhancement or departed upward without the required explanation – are also unavailing.

First, Adona's challenge to the "use of violence" enhancement is both waived and without merit. Adona agreed -- not only in his plea agreement, but also multiple times in open court -- that the § 2D1.1(b)(2) enhancement applied (J.A.:104; 7/28/15 Tr. 40; S.A.:573). Also, contrary to his current claim that the two offenses were separate (Adona Brief at 16-17, 19), he expressly argued that the attempted ADW was "not really a separate crime" because it was "part of the same series of events" (S.A:574-75). Having agreed to the enhancement in the district court, Adona cannot now claim that the court's guidelines calculations were

---

[30] At most, if this Court found all the elements of the plain-error standard, the proper remedy would be remand to allow the district court to consider § 5G1.3 and then to exercise its discretion again under § 3584(a).

erroneous. *See, e.g., United States v. Moore*, 703 F.3d 562, 571-72 (D.C. Cir. 2012) (where defendant "accepted as accurate" district court's criminal-history calculation, he could not complain about that calculation on appeal).

Furthermore, the district court's application of the § 2D1.1(b)(2) enhancement does not reflect error, much less the plain error Adona would be required to show. *See United States v. Brown*, 808 F.3d 865, 870 (D.C. Cir. 2015) (unpreserved procedural-error claims reviewed "under the four-part plain error test"). The Carrington shooting properly was considered because it was "relevant conduct" for the purposes of Adona's conspiracy sentencing. *See* U.S.S.G. § 1B1.3(a)(1) & (2). Adona shot Carrington because of a dispute that began at 23rd Street -- i.e., Woodberry Village  -- after Carrington was "very loud and . . . didn't care if he was drawing attention" to Adona's activities in the area (J.A. 100; 9/23/14 Tr. 6). Thus, the shooting grew out of both Adona's "preparation for" the PCP conspiracy and his "attempt[] to avoid detection" for his PCP dealing in Woodberry Village. § 1B1.3(a)(1)(2); *see, e.g., United States v. Hodge*, 354 F.3d 305, 313 (4th Cir. 2004) (prior offenses part of same course of conduct if "sufficiently connected or related to each other as to

72

warrant the conclusion that they are part of a[n] . . . ongoing series of offenses").[31]

Second, Adona's claim (at 21-24) that the district court imposed a sentence that effectively departed upwards from the guidelines never gets off the ground, because the district court did not "impose" any portion of the 28-month sentence from Adona's Superior Court conviction. Adona already had been sentenced by the time Judge Leon imposed his conspiracy sentence, and that federal sentence was for 108 months, which was within the guidelines range.

---

[31] If, contrary to Adona's position in the district court, the ADW offense was not relevant conduct, then it would have been an unrelated "prior sentence" and should have been counted in his criminal history. *See* U.S.S.G. §§ 4A1.1 & 4A1.2(a). As a result, Adona would have been in criminal-history category IV, and his guideline range, without the § 2D1.1(b)(2) enhancement, would have been 84-105 months, instead of 87-108 months. Because the district court evidently wanted to sentence at the top of the range, Adona at most would have saved only three months under this scenario.

## V.  Matthews's Sentencing Claims Fail.

### A.  Attempted ADW is a Crime of Violence.

#### 1.    Background

Matthews's PSR writer reported that the base-offense level for Matthews's FIP conviction was 22, because, in pertinent part, Matthews had a prior "felony conviction [for a] *crime of violence*" (J.A.:523 (sealed) (citing U.S.S.G. § 2K2.1(a)(3)(B)) (emphasis supplied).[32] The germane conviction was a 2011 D.C. attempted ADW (J.A.:525). With various enhancements, the PSR writer calculated Matthews's total offense level as 26, which, with a criminal-history category of III, resulted in a guidelines range of 78-97 months (J.A.:523-31).

Matthews argued that his correct base-offense level was 14, because his attempted ADW conviction was not a crime of violence (D.E. 273 at 8-11; 7/20/15 Tr. 22-23). Specifically, he noted that a prior conviction qualifies as a crime of violence "only if it has as an element the use, attempted use, or threatened use of physical force against the person of another," and he contended that because his conviction had been of the

---

[32] The applicable unenhanced base-offense level for FIP was 14. U.S.S.G. § 2K2.1(a)(6).

"intent to frighten" variety, it did not qualify (D.E. 273 at 9-11; 7/20/15 Tr. 22-23). Matthews further claimed that the "attempt" aspect of his prior conviction gave the district court "more wiggle room" to determine that the offense was not for a crime of violence (7/20/15 Tr. 23). The district court concurred with the PSR writer's calculations in all respects (7/28/15 Tr. 4-5).

## 2.    Standard of Review and Legal Principles

This Court reviews de novo the district court's determination that a given offense is a "crime of violence" for guidelines purposes. *See, e.g.*, *In re Sealed Case (I)*, 548 F.3d 1085, 1090 (D.C Cir. 2008).

U.S.S.G. § 2K2.1(a)(3)(A) sets a defendant's base-offense level for FIP at 22, where, in pertinent part, "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of . . . a crime of violence . . . ." *Id.* Application Note 1 to § 2K2.1 explains that "crime of violence" is defined by § 4B1.2(a) and Application Note 1 of that section.

§ 4B1.2, in turn, defines "crime of violence" as:

> (a) . . . any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that---

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

§ 4B1.2(a)(1) is known as the "elements clause," and the portion of § 4B1.2(a)(2) beginning with "or otherwise" is known as the "residual clause." *See, e.g., United States v. Sheffield*, 832 F.3d 296, 312 (D.C. Cir. 2016). Application Note 1 to § 4B1.2 explains that the definition of "crime of violence" includes attempts to commit qualifying offenses.

The elements of D.C. ADW are: "(1) an attempt, with force or violence, to injure another, or a menacing threat, which may or may not be accompanied by a specific intent to injure; (2) the apparent present ability to injure the victim; (3) a general intent to commit the acts which constitute the assault; and (4) the use of a dangerous weapon in committing the assault." *Spencer v. United States*, 991 A.2d 1185, 1192 (D.C. 2010) (internal quotation omitted). Attempt requires that the defendant "(1) intended to commit the crime, and (2) committed an overt act towards completion of the crime that (3) came within dangerous

76

proximity of completing the crime." *Nkop v. United States*, 945 A.2d 617, 620 (D.C. 2008) (internal quotation omitted).

### 3.  Discussion

Attempted ADW is a crime of violence under either the elements clause or the residual clause of § 4B1.2.[33]

### i.  The Elements Clause

ADW's elements require "the use, attempted use, or threatened use of physical force against the person of another." § 4B1.2(a)(1). Specifically, ADW's requirement that the defendant "*use  . . . a dangerous weapon in committing the assault,*" *Spencer*, 991 A.2d at 1192 (emphasis supplied), satisfies § 4B1.2(a)(1)'s elements clause.  *See, e.g., United States v. Redrick*, 841 F.3d 478, 483-84 (D.C. Cir. 2016) ("element of 'use' of a dangerous . . . weapon [in Maryland armed robbery conviction] supplie[d] at minimum a "threat" of physical force," and thus satisfied

---

[33] In determining whether a prior conviction is a "crime of violence" for guidelines purposes, courts "consider the offense generically . . . in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay v. United States*, 553 U.S. 137, 141 (2008).

the elements clause of the Armed Career Criminal Act ("ACCA");[34] *United States v. Collins*, 811 F.3d 63, 65-67 (1st Cir. 2016) (Maine threats offense that required threat to "occur through the use of a dangerous weapon" was crime of violence under § 4B1.2(a)(1)); *United States v. Ovalle-Chun*, 815 F.3d 222, 225-27 (5th Cir. 2016) (Delaware offense for displaying apparent deadly weapon a crime of violence under identical language in U.S.S.G. § 2L1.2); *United States v. Taylor,* 843 F.3d 1215, 1223-24 (10th Cir. 2016) (Oklahoma version of ADW a crime of violence under § 4B1.2(a)(1), because "the use of a dangerous weapon during an assault or battery always constitutes a sufficient threat of force to satisfy the elements clause"); *United States v. Smith*, 2015 WL 5136871, at *3 (D. Md. 2015) (D.C. ADW a crime of violence under § 4B1.2(a)(1) because, inter alia, "[w]hen the use of a dangerous weapon is added to the degree of forces contained in the first three elements of ADW . . . it is violent

---

[34] While *Redrick* addressed the definition of "violent felony" under the ACCA, the statutory language it was interpreting -- 18 U.S.C. § 924(e)(2)(B)(i) -- was identical to § 4B1.2(a)(1). Because of this identical wording, precedents evaluating the wording in one context generally apply to the other. *See, e.g., United States v. Hill*, 131 F.3d 1056, 1062 & n.6 (D.C. Cir. 1997). *But see Beckles v. United States*, 137 S. Ct. 886 (2017) (discussed infra).

force"). Indeed, the Supreme Court has noted that, in its generic form, ADW is a crime of violence. *See* (*Curtis*) *Johnson v. United States*, 559 U.S. 133, 140-41 (2010) (in ACCA context, quoting Black's Law Dictionary definition of "violent felony" as a "crime  . . . such as  . . . assault and battery with a dangerous weapon").

Matthews fails to grapple with ADW's "use of a dangerous weapon" requirement and conceptualizes instead an offense of "simple assault plus the fact that the assault is committed *with* a dangerous weapon" (Matthews's Brief at 10-14) (emphasis supplied). As a result, Matthews relies in error on *Redrick*, 841 F.3d 478 (Matthews Brief at 12) (purporting to distinguish *Redrick* because ADW does not require "use" of a weapon). Far from aiding him, *Redrick* forecloses Matthews's elements-clause claim. Focusing on the same "use" verb in the context of a Maryland armed-robbery conviction, *Redrick* explained that the requirement to "use . . . a dangerous or deadly weapon" during the course of a robbery meant that "the required degree of force [for ACCA's elements/force clause] . . . is present." 841 F.3d at 484. Thus, it is *Redrick*, and not *United States v. Parnell*, 818 F.3d 974 (9th Cir. 2016) (Matthews Brief at 12-13), that is analogous here. *Compare Parnell*, 818 F.3d at 980

79

(Massachusetts armed-robbery statute at issue did "not require a weapon be used"); *see also United States v. Whindleton*, 797 F.3d 105, 111-16 (1st Cir. 2015) (Massachusetts crime of assault "by means of a dangerous weapon" qualified under ACCA's elements clause because of required use of weapon).

Matthews's D.C. cases do not help him. In *Parks v. United States*, 627 A.2d 1, 4 (D.C. 1993), the government was required to show that the defendant "used a dangerous weapon" during the assault. *Id*. Contrary to Matthews's suggestion (at 12), the defendant in *Parks* did not just passively possess the pistol: he brought it up "all in one continuous motion" with the intent of either "frightening the officer" or "actually . . . shooting him." 627 A.2d at 6. In *Perry v. United States*, 36 A.3d 799, 811-14 (D.C. 2011), the "use of a dangerous object" was presumed in the definition of ADW; the issue in *Perry* was the not the use but rather the nature of the object used. *Id*.[35]

---

[35] Two D.C. District Court judges have recently held that D.C. ADW is not a "violent felony" within the meaning of the ACCA's elements clause. *See United States v. Marlon Haight*, 15-cr-88 (unpublished ruling at sentencing on 12/1/2016 by Judge Boasberg); *United States v. Tarik Butler*, --- F. Supp. 3d --- , 2017 2304215 (D.D.C. May 25, 2017) (Judge Kollar-Kotelly). *Haight* and *Butler* are inapplicable here. First, in both

The fact that Matthews's prior convicted was for attempted, rather than completed, ADW does not affect the elements-clause analysis. Application Note 1 of § 4B1.2(a) expressly provides that the definition of "crime of violence" includes "attempting to commit such offenses." *Id*. This commentary is "authoritative." *Stinson v. United States*, 508 U.S. 36, 38 (1993) (guidelines commentary authoritative with exceptions inapplicable here). Matthews's citation to *United States v. Rollins*, 836 F.3d 737, 743 (7th Cir. 2016), is inapposite, because that case dealt not with the "attempt" aspect of Application Note 1, but rather the "list of qualifying crimes" in the note's second paragraph. *Id*. at 743. *See also, e.g., United States v. Mack*, 855 F.3d 581, 585-86 (4th Cir. 2017) (holding that Application Note 1 is "authoritative," and applying that note's "attempt" language to the entirety of § 4B1.2(a)); *Hill v. United States*,

---

*Haight* and *Butler*, the district court based its ruling on the fact that D.C. ADW can be committed recklessly. *Id*. Matthews has not presented this mens-rea claim, and, therefore, has waived it. *See, e.g., Taylor*, 339 F.3d at 977. Second, because *Haight* and *Butler* dealt with the ACCA and not with § 4B1.2(a), the residual clause was not available to the district court in either of those cases. Third, even in the ACCA context, appellee contends that *Haight* and *Butler* were wrongly decided in light of the Supreme Court's decision in *Voisine v. United States*, 136 S. Ct. 2272 (2016).

827 F.3d 560, 562 (7th Cir. 2016) (recognizing Application Note 1's application in attempted murder context). Under the elements clause of § 4B1.2(a)(1), therefore, D.C. attempted ADW is a "crime of violence."

### ii.  The Residual Clause

Matthews's attempted ADW offense also qualifies under the residual clause of § 4B1.2(a)(2). Matthews admits that, at a minimum, the "weapon element of ADW encompasses conduct that produces . . . a risk of violent force" (Matthews Brief at 13). This "risk" is contemplated by § 4B1.2(a)(2)'s residual clause, which includes convictions "involv[ing] conduct that presents a serious potential risk of physical injury to another." *Id*; *see also Parnell*, 818 F.3d at 980 ("Offenses presenting . . . a risk of violence fall within ACCA's residual clause").[36]

Indeed, Matthews does not contend that the text of § 4B1.2(a)(2)'s residual clause fails to encompass attempted ADW. Rather, Matthews's lone residual-clause argument is that, because the Supreme Court held the ACCA's residual clause void for vagueness in *(Samuel) Johnson v.*

---

[36] Like the elements clause, the language of ACCA's residual clause -- 18 U.S.C. § 924(e)(2)(B)(ii) (voided by *(Samuel) Johnson*) -- is identical to the residual clause in § 4B1.2(a)(2).

*United States*, 135 S. Ct. 2551 (2015), § 4B1.2(a)(2)'s identically-worded residual clause must also fall (Matthews Brief at 14-15). Yet *Beckles v. United States*, 137 S. Ct. 886 (2017), decided after Matthews filed here, squarely rejected this claim and held that § 4B1.2(a)(2)'s residual clause remains viable after *(Samuel) Johnson*. 137 S. Ct. at 890. In explaining the difference between the ACCA and guidelines residual clauses, the Supreme Court held:

> Unlike the ACCA . . . the advisory Guidelines do not fix the permissible range of sentences. To the contrary, they merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range. Accordingly, the Guidelines are not subject to a vagueness challenge under the Due Process Clause. The residual clause in § 4B1.2(a)(2) therefore is not void for vagueness.

*Id.* at 892. With *(Samuel) Johnson* cut out from under him, Matthews's residual clause claim collapses. *See, e.g., Beckles*, 137 S. Ct. at 890 (*possession* of sawed-off shotgun sufficient to satisfy § 4B1.2(a)(2) residual clause); *United States v. Thompson*, 851 F.3d 129, 130-31 (1st Cir. 2017) (affirming, in light of *Beckles*, district court's determination that Massachusetts ADW was a crime of violence under § 4B1.2(a)(2)'s residual clause).

83

## C.  The District Court Adequately Explained Matthews's Sentence.

At sentencing, the district court explained Matthews's sentence as follows:

> You [were] engaged . . . in a drug operation . . . with . . . others . . . . [y]ou were involved with a lot of weapons [a]nd . . . related acts of violence . . . . [I]t is very important to deter you from engaging in any conduct of this kind in the future.  Now, you'll be deterred during the time you're in jail, for certain. But it is my sincere hope that . . . you'll be deterred from ever going back to . . . selling drugs and carrying weapons, and engaging in actions that are violent in their very nature. Of course, the Court also wants to deter others. There were young folks in that neighborhood, undoubtedly, who were aware of what you were doing and . . . maybe even looked to you or aspired to be like you. And we want to deter them from engaging in conduct of that kind, because that leads to more violence and more drug sales in the community. And . . . the Court needs to protect the community from that kind of conduct.  We can't have people out selling drugs and running around with weapons . . . that can go off and . . . hurt folks, whether they be little kids in an apartment or . . . police officers trying to do their job across the street. The Court also needs to promote respect . . . not only for you . . . but for others to have for the law. So for all of those reasons, a sentence at the high end of the guideline range, in my judgment, is not sufficient . . . . Something more than that has to be done in order to deter you and others, protect the community, promote respect for the law, and . . . give you a fair and adequate punishment under the circumstances. So . . . I've decided to vary upwards to 108 months. . . . And I'm doing it symbolically to make a point, that it's important that . . . you and others see that this kind of conduct has to stop, that you need to be deterred, they need to be deterred, and that the community, of course . . . and you need to respect the law. (S.A.:569-70.)

The court sentenced Matthews to 108 months of incarceration followed by 36 months of supervised release (S.A.:570; 9/1/15 Tr. 30).

Because Matthews did not complain in the district court, this Court will review the district court's rationale for Matthews's sentence for plain procedural error. *See, e.g.*, *United States v. Akhigbe*, 642 F.3d 1078, 1085 (D.C. Cir. 2011).

Matthews cannot show plain error, or error at all. The district court emphasized not only Matthews's extensive involvement with drugs and guns, but also the vast impact of Matthews's actions on the community as a whole ("The Court needs to protect the community from that kind of conduct"), and the need for the Court's sentence to "promote respect" for the law both by the community and by Matthews (S.A.:569-70). As a subset of the community impact, the district court noted the impact on children in the neighborhood who had been either influenced by Matthews, put in danger by his drug dealing and gun possession and that of his co-conspirators, or both (*id*.). The court appropriately could consider the impact of Matthews's conduct on the community. *See United States v. Jones*, 846 F.3d 366, 372-73 (D.C. Cir. 2017) (community impact of crimes proper sentencing consideration). Furthermore, none of the

guidelines provisions cited by Matthews (at 17-20) accounted for this community-impact aspect of Matthews's actions; this factor alone made Matthews's conduct "more harmful or egregious than the typical case." *United States v. (James) Brown*, 808 F.3d 865, 871 (D.C. Cir. 2015). Indeed, the district court expressly pegged its above-guidelines sentence to this community impact (S.A.:570 ("Something more than [a guidelines sentence] has to be done in order to deter you and others, protect the community, promote respect for the law, and . . . give you a fair and adequate punishment under the circumstances").

Moreover, consideration of "factors already taken into account" by the guidelines in varying upward is "not error" where, inter alia, the "guidelines do not fully account for those factors." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014). As the evidence at trial and the text messages provided by the government at sentencing demonstrated, Matthews -- despite being acquitted of all drug offenses -- was demonstrably involved in dealing large amounts of PCP (D.E. 263 at 19 (detailing over $11,000 dollars of PCP transactions over approximately three-month period)). Matthews's extensive involvement with drugs, when coupled with the impact on the residents of Woodberry

Village, made this far from a run-of-the mill FIP case.  As a result, Matthews cannot show error at all, much less plain error, in the district court's explanation for its sentence, which varied by 11 months from the top of the guidelines.

The cases on which Matthews relies are distinguishable.  In *Akhigbe*, the district court's discussion of any community impact of the defendant's health-care fraud was highly attenuated from the facts of the case, and included a discussion of about the negative consequences of health-care fraud on the national health-care system writ large. 642 F.3d at 1086. In *In re Sealed Case (II)*, the district court, "without providing any explanation at all," sentenced the defendant to a sentence that was twice the high-end of the applicable guideline range. *In re Sealed Case (II),* 527 F.3d 188, 190-94 (D.C. Cir. 2008).[37] Unlike in *(James) Brown*, where the district court's "spare and unparticularized characterization of

---

[37] Here, in addition to its on-the-record explanation, the district court filed a written statement of reasons which further indicated that it sentenced Matthews to an above-guidelines sentence because of:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and (3) the need to afford adequate deterrence (J.A.:570).

87

[the defendant's conduct] . . . closely track[ed] the code provision to which Brown pled," 808 F.3d at 872, here, the district court explained why the impact of Matthews's conduct went far beyond mere possession of a weapon by a felon.[38]

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgments of the district court should be affirmed.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

ELIZABETH TROSMAN
ELIZABETH H. DANELLO
TEJPAL S. CHAWLA
GEORGE P. ELIOPOULOS
Assistant United States Attorneys

_____/s/_____

JAMES A. EWING, D.C. Bar #998829
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
(202) 252-6829

---

[38] If this Court were to find plain-error in the district court's explanation of Matthews's sentence, the proper remedy would be to remand to the district court for resentencing. *See, e.g., (James) Brown*, 808 F.3d at 874.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(a)(7)(C), and this Court's orders of November 7, 2016, and April 10, 2017, that this brief contains 18,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as well as this Court's orders cited above. This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

———————————————
/s/

JAMES A. EWING
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Consolidated Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellants, as follows: Mr. Jonathan Zucker, Esq., (appellant Matthews), Ms. Barbara Kittay, Esq. (appellant Adona), Ms. Mary Davis (appellant Boston), Mr. Pleasant Brodnax, III (appellant Boston), and Ms. Christine Pembroke (appellant Brown), on this the 12th day of July, 2017.

/s/
JAMES A. EWING
Assistant United States Attorney